STATE of Wisconsin, Plaintiff-Respondent,

v.

Keith M. BOHANNON, Defendant-Appellant.†

Court of Appeals

*No. 2012AP1691–CR. Submitted on briefs April 2, 2013.
—Decided June 11, 2013.*

2013 WI App 87

(Also reported in 835 N.W.2d 262.)

† Petition for Review Filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Susan M. Roth* of *Kohn & Smith Law Offices*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Christine A. Remington*, assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. CURLEY, P.J.  Keith M. Bohannon appeals the judgment convicting him of felony murder, as party to a crime, contrary to WIS. STAT. §§ 940.03 & 939.05 (2009–10).[2] He also appeals the order denying his motion for postconviction relief.[3] On appeal, Bohannon argues that:  the trial court erred in denying his motion to substitute a judge who was first assigned to the case, and who was later—following Milwaukee County's judicial rotation—scheduled to be reassigned to the case after a second judge had been assigned; the trial court erred by not allowing ten hours of audio recordings to be played at trial; and there was insufficient evidence to support the jury's verdict. We affirm.

## BACKGROUND

### A.  Nature of the Case

¶ 2.  Bohannon was charged on February 5, 2010, with armed robbery, as party to a crime, for his role in a revenge plot that proved fatal for victim Jordan Larson. Larson and Bohannon were close friends who considered themselves brothers. Bohannon's feelings changed, however, when someone attempted to rob him. Believing that Larson set him up, Bohannon hatched a revenge plot with friend Antonio Tatum, whereby Bohannon would drop off Larson at a particular location and Tatum would rob Larson and split the proceeds with Bohannon. According to the criminal complaint, on the day of the

---

[2] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

[3] Bohannon does not expressly indicate that he is appealing from the order denying his postconviction motion; however, his appellate brief raises an argument that was also raised in the postconviction motion. We therefore assume that Bohannon appeals both the judgment of conviction and the order denying his postconviction motion.

371

planned robbery, Bohannon drove Larson to various places to run errands, including the bank. Thereafter, Bohannon dropped off Larson in an alley where Tatum was waiting. A neighbor heard gunshots and called 9-1-1, and when police arrived at the alley, they found Larson on the ground with gunshot wounds to his head and back. Larson told police that "Keith's guy" had shot him and that $2000 had been stolen from him. Three days after the robbery and shooting, Larson was pronounced dead. Along with Bohannon, Antonio Tatum was charged with armed robbery, as party to a crime; Tatum was also charged with felony murder.

*B. Judicial Rotations, Amended Information, and Motion to Substitute*

¶ 3. Bohannon's case was assigned to Judge Rebecca Dallet on February 5, 2010. That same day, the preliminary hearing and arraignment were scheduled for February 19, 2010. On February 19, 2010, Bohannon waived his right to a preliminary hearing and entered a plea of not guilty. On April 8, 2010, Judge Dallet informed the parties that in August the case would be assigned to Judge Dennis Cimpl.

¶ 4. The case transferred to Judge Cimpl on August 1, 2010. Several months later, however, the parties were informed that the case would be transferred back to Judge Dallet on August 1, 2011.

¶ 5. On May 27, 2011, while Judge Cimpl was still presiding over the case, the State filed an amended information, and Bohannon filed a motion to substitute judge. The amended information substituted a charge of felony murder as party to a crime for the original armed robbery charge against Bohannon. Bohannon's motion to substitute judge was a motion to substitute Judge Dallet, made in anticipation of the August 2011

372

transfer. The motion, which appears in the record, stated: "Pursuant to [Wis. Stat. §] 971.20, [Bohannon] requests substitution of a new judge for Judge Dallet, the judge assigned to this case." Moreover, at the arraignment held on the same day that the amended information and motion to substitute were filed, May 27, 2011, Bohannon's attorney made clear that Judge Dallet was the judge to be substituted:

> As time goes on, it is our desire to substitute on Judge Dallet, that is our position, we believe we have a right to do so. If the State agrees that she is a new judge then I believe, again . . . there is no question we have a right to substitute.

¶ 6. The trial court denied Bohannon's motion to substitute judge, and on August 1, 2011, the case was transferred back to Judge Dallet. Trial began on September 19, 2011, and continued through September 23, 2011.

## C. Introduction of Audio Recordings at Trial

¶ 7. On the first day of trial, the State sought to introduce audio recordings of portions of the statements Bohannon gave to police from January 31, 2010, to February 2, 2010, as well as transcripts of the audio recordings. Of the nearly ten hours of audio recording of Bohannon's questioning by police, the State sought to introduce approximately one hour's worth. The State gave Bohannon transcripts of the statements it sought to introduce. Bohannon, concerned about the accuracy of the transcripts, asked that the court play the recordings in their entirety—in other words, the full ten hours—without the transcripts. The trial court gave Bohannon the opportunity to point out errors in the transcripts so that amendments could be made; how-

373

ever, the court refused to require the State to play ten hours of recordings, finding that Bohannon had not identified portions showing it to be necessary.

¶ 8.  The parties subsequently agreed to revise the transcripts, and the State agreed to omit some portions of the recording per Bohannon's request. Bohannon's attorney also said he was satisfied that the recordings the State planned to introduce included the portions that Bohannon wanted the jury to hear.

¶ 9.  The recordings and transcripts were introduced during the testimony of Detectives Matthew Goldberg and Tom Casper. During Detective Goldberg's testimony, the State played a portion of an interview of Bohannon on January 31, 2010. The court read the relevant instruction, and told the jury to trust their ears instead of the transcript. When the State played a portion of the interview, Bohannon did not object, nor did he attempt to introduce the omitted portions during cross-examination. During Detective Tom Casper's testimony, the State played a portion of another interview of Bohannon. Again, Bohannon did not object, nor did he attempt to introduce the omitted portions during cross-examination. On redirect of Detective Casper, the State introduced a third recorded interview with Bohannon. Once again, Bohannon did not object, and did not attempt to introduce the omitted portions of the recording.

### D.  Testimony Regarding Bohannon's Intent to Rob Larson

¶ 10.  Bohannon gave numerous statements to police regarding the planning of the robbery and the events leading up to Larson's death, which the investigating detectives testified to at trial.[4]

---

[4] Bohannon did not testify at trial.

¶ 11. Detective Casper testified that Bohannon wanted to have Larson robbed because he believed that Larson set him up to be robbed a few weeks before the incident. Bohannon had not actually been robbed because he ran, and he was worried that Larson would do the same when Tatum attempted to rob him. Casper testified that the original plan had Tatum robbing both Larson and Bohannon using a gun. That plan was allegedly changed, and Bohannon later stated that no guns were to be used.

¶ 12. Detective Casper further testified to the events that occurred prior to Tatum robbing Larson. Bohannon picked up Larson early in the morning of January 30, 2010. He and Larson went to a convenience store and then to the bank. At the bank, Bohannon stated that Larson attempted to withdraw some cash at the drive-through window, but had to go into the bank due to the size of the transaction. Following their trip to the bank, Bohannon and Larson went to Walgreen's and to a Citgo gas station. While at the gas station, Bohannon made a phone call out of Larson's earshot wherein he advised Tatum of his and Larson's location. Following their course of errands, Bohannon dropped Larson off in the alley located behind Larson's grandmother's house. About twenty minutes later, Bohannon stated he tried to call Larson's phone, but received no answer.

¶ 13. Detective Casper testified that Bohannon called Tatum immediately after learning that Larson had been shot. Bohannon called Tatum because he wanted to know where the money was and to negotiate his share.

¶ 14. Detective Casper further testified that Bohannon "talk[ed] out of both sides of his mouth" regarding Tatum's plan to use a gun to rob Larson. For example, while Bohannon did tell police that at one

point he told Tatum that no guns were to be used, Bohannon also told police after the fact that they would find the gun with Tatum. Additionally, Bohannon identified and accurately described the gun used in the shooting.

¶ 15.   The jury found Bohannon guilty of felony murder, as party to a crime. He filed a postconviction motion, which was denied, and now appeals.

### ANALYSIS

¶ 16.   Bohannon brings three arguments on appeal. He argues that:  (a) the trial court erred in denying his motion to substitute Judge Dallet; (b) the trial court erred by not allowing ten hours of audio recordings to be played at trial; and (c) there was insufficient evidence to support the jury's verdict. We discuss each argument in turn.

*A.   The trial court properly denied the motion to substitute Judge Dallet.*

¶ 17.   Bohannon argues that the trial court erred in denying his motion to substitute Judge Dallet. According to Bohannon, because the trial court erred in denying his motion, Judge Dallet did not have jurisdiction over his case when she was reassigned in August 2011.

■

¶ 18.   WISCONSIN STAT. § 971.20 governs a criminal defendant's right to substitute a trial judge, and we therefore review the trial court's decision *de novo. See State v. Dwyer*, 181 Wis. 2d 826, 836, 512 N.W.2d 233 (Ct. App. 1994) ("construction of a statute presents a question of law, subject to *de novo* review on appeal"). Our inquiry " 'begins with the language of the statute.' "

*See State ex rel. Kalal v. Circuit Court for Dane Cnty.,*
2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110
(citation omitted). We give statutory language "its com-
mon, ordinary, and accepted meaning," and give "tech-
nical or specially-defined words or phrases" "their tech-
nical or special definitional meaning." *See id.* We must
also keep in mind that "[c]ontext is important to mean-
ing. So, too, is the structure of the statute in which the
operative language appears." *See id.,* ¶ 46. Therefore,
we interpret statutory language "in the context in
which it is used; not in isolation but as part of a whole;
in relation to the language of surrounding or closely-
related statutes; and reasonably, to avoid absurd or
unreasonable results." *See id.*

¶ 19. WISCONSIN STAT. § 971.20 provides, in perti-
nent part:

> (4) SUBSTITUTION OF TRIAL JUDGE ORIGINALLY ASSIGNED.
> A written request for the substitution of a different
> judge for the judge originally assigned to the trial of the
> action may be filed with the clerk before making any
> motions to the trial court and before arraignment.

> (5) SUBSTITUTION OF TRIAL JUDGE SUBSEQUENTLY AS-
> SIGNED. If a new judge is assigned to the trial of an action
> and the defendant has not exercised the right to sub-
> stitute an assigned judge, a written request for the
> substitution of the new judge may be filed with the
> clerk within 15 days of the clerk's giving actual notice
> or sending notice of the assignment to the defendant or
> the defendant's attorney. If the notification occurs
> within 20 days of the date set for trial, the request shall
> be filed within 48 hours of the clerk's giving actual
> notice or sending notice of the assignment. If the
> notification occurs within 48 hours of the trial or if
> there has been no notification, the defendant may make
> an oral or written request for substitution prior to the
> commencement of the proceedings.

¶ 20. Applying the pertinent sections of Wis. Stat. § 971.20 to the facts before us, there is no doubt that Judge Dallet was the judge "originally assigned" to the case under § 971.20(4). Judge Dallet was originally assigned to Bohannon's case the same day the criminal complaint was filed—February 5, 2010. At that time, the preliminary hearing and arraignment were scheduled for February 19, 2010. Therefore, pursuant to § 971.20(4), Bohannon should have filed his motion before February 19, 2010.

¶ 21. Bohannon argues, however, that Judge Dallet was also a "new" judge under Wis. Stat. § 971.20(5) because she was later reassigned to the case after Judge Cimpl took the case from her. Using the definition of "new judge" articulated in *State ex rel. Warrington v. Circuit Court for Shawano County*, 100 Wis. 2d 726, 730, 303 N.W.2d 590 (1981) ("a new judge is one who substitutes for the judge assigned"),[5] Bohannon argues that Judge Dallet was "new" because she substituted for Judge Cimpl. Therefore, according to Bohannon, he should have been given a second chance to substitute Judge Dallet.

¶ 22. We disagree. While Judge Dallet did in fact substitute for Judge Cimpl on August 1, 2011, she was not a "new" judge under Wis. Stat. § 971.20(5) because she was the judge originally assigned to the case. While we acknowledge that the statute does not directly

---

[5] It should be noted that *State ex rel. Warrington v. Circuit Court for Shawano County*, 100 Wis. 2d 726, 730, 303 N.W.2d 590 (1981), was decided on March 31, 1981, when the language and organization of Wis. Stat. § 971.20 was much different. *See* § 971.20 (1979–80). After *Warrington* was decided, § 971.20 was repealed and recreated with language that tracks the current statute. *See* 1981 Wis. Laws, ch. 137, published March 30, 1982.

contemplate the situation before us—where the original judge assigned later is reassigned back to the case—we think our conclusion comports with the statutory language. *See Kalal,* 271 Wis. 2d 633, ¶ 45. The statute provides different definitions and separate rules governing the substitution of an "original" versus a "new" judge, *see* § 971.20(4)-(5), and if we were to determine that a judge could be both "original" *and* "new," our decision would lead to a tortured reading of what is, in our opinion, very straightforward statutory language, *see Kalal,* 271 Wis. 2d 633, ¶ 46.

¶ 23. Our conclusion also comports with the policy underlying the statute. As Judge Dallet was the first judge assigned to the case, Bohannon already had the opportunity to file a motion to substitute her under Wis. Stat. § 971.20(4). Contrary to what Bohannon argues, the fact that the State filed an amended information at the time he learned that Judge Dallet would be reassigned does not create the need for a second chance at substitution. Doing so would only delay trial. Indeed, as the State correctly notes, one of the reasons that Wis. Stat. § 971.20 was amended in 1981 was to avoid using substitution to delay criminal trials. *See State ex rel. Mace v. Circuit Court for Green Lake Cnty.,* 193 Wis. 2d 208, 222 n.1, 532 N.W.2d 720 (1995) (Wilcox, J., concurring) ("Section 971.20 . . . is not to be used for delay nor for 'judge shopping,' but is to ensure a fair and impartial trial for the defendants."). *Cf. also State v. Escalona-Naranjo,* 185 Wis. 2d 168, 185, 517 N.W.2d 157 (1994) (requiring criminal defendants to consolidate all their postconviction claims into one motion or appeal).

¶ 24. Moreover, we are not persuaded by Bohannon's argument that he could not have exercised his right to substitute at the time of his original arraignment because Tatum, his co-defendant, was not present

at the preliminary hearing to jointly make the request pursuant to WIS. STAT. § 971.20(6). Bohannon's argument is conclusory, undeveloped, and does not explain why Tatum's absence from the hearing prevented him from filing a joint motion to substitute. We therefore will not consider it. *See State v. McMorris*, 2007 WI App 231, ¶ 30, 306 Wis. 2d 79, 742 N.W.2d 322 ("we may choose not to consider arguments unsupported by references to legal authority, arguments that do not reflect any legal reasoning, and arguments that lack proper citations to the record").

¶ 25. Likewise, we are also not persuaded that Bohannon's counsel who appeared with him at his initial appearance on February 5, 2010, was *"per se* ineffective when he did not advise [him] of his right to a substitution of judge." Bohannon's argument is conclusory, undeveloped, and fails to discuss how counsel's alleged error was either deficient or prejudicial, *see State v. Mayo*, 2007 WI 78, ¶ 33, 301 Wis. 2d 642, 734 N.W.2d 115 (defendant alleging ineffective assistance of counsel must prove both that (1) trial counsel's performance was deficient and (2) this deficient performance was prejudicial), and we will not consider it, *see also McMorris*, 306 Wis. 2d 79, ¶ 30.

¶ 26. In sum, because Judge Dallet was the "original" judge assigned to the case pursuant to WIS. STAT. § 971.20(4), she was not a "new" judge under § 971.20(5), and, pursuant to § 971.20(4), Bohannon was required to file his motion to substitute Judge Dallet the first time she was assigned, before the arraignment. As noted, this would have been before February 19, 2010. *See id.* Bohannon's May 27, 2011 motion was therefore untimely and was properly denied.

B. The trial court properly limited the length of the audio recordings introduced *at trial*.

¶ 27.   Bohannon also argues that the trial court erred by not allowing him to play the entire ten hours of audio recordings at trial. According to Bohannon, the decision to limit the audio recordings violated the rule of completeness, *see* Wis. Stat. § 901.07, because the jury was not able to understand the context of his statements. Bohannon argues that "had the jury heard detectives pushing and pushing [him] to make an admission . . . the[] jury would have given different consideration to [his] statements, and found that if not made under duress, they certainly were made at the behest of detectives who pushed [him] for hours to say what they (the detectives) wanted to hear."

██

¶ 28.   We disagree. First, Bohannon's argument is insufficiently developed. Bohannon does not direct us to any particular portions of the recordings that he claims ought to have been included so that we might evaluate them; and the record on appeal does not include the recordings to which Bohannon refers. Moreover, Bohannon does not cite to any of the transcripts of the recordings that are a part of the record. *See McMorris*, 306 Wis. 2d 79, ¶ 30. Consequently, we must assume that the trial court did not err in deciding to limit the length of the recordings. *See State v. Provo*, 2004 WI App 97, ¶ 19, 272 Wis. 2d 837, 681 N.W.2d 272 ("It is the appellant's responsibility to ensure completion of the appellate record and 'when an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the trial court's ruling.' ") (citations and one set of quotation marks omitted). Second, Bohannon

agreed at trial that all of the necessary portions of the recordings were in fact played. Therefore, he waived his right to challenge the admissibility of the recordings on appeal. *See State v. Huebner*, 2000 WI 59, ¶ 10, 235 Wis. 2d 486, 611 N.W.2d 727.

## C. Sufficient evidence supports the verdict.

¶ 29.  Bohannon further argues that there is insufficient evidence to support his conviction. We review sufficiency of the evidence claims in the light most favorable to the jury's verdict. *See State v. Booker*, 2006 WI 79, ¶ 22, 292 Wis. 2d 43, 717 N.W.2d 676; *Bautista v. State*, 53 Wis. 2d 218, 223, 191 N.W.2d 725 (1971). Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, we must adopt the inference that supports the verdict. *State v. Poellinger*, 153 Wis. 2d 493, 506–07, 451 N.W.2d 752 (1990).

¶ 30.  "The standard for determining whether sufficient evidence supports a finding of guilt . . . is . . . well established." *State v. Watkins*, 2002 WI 101, ¶ 67, 255 Wis. 2d 265, 647 N.W.2d 244. We cannot reverse a criminal conviction unless the evidence, viewed most favorably to the State and the conviction, " 'is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.' " *Booker*, 292 Wis. 2d 43, ¶ 22 (citing *Poellinger*, 153 Wis. 2d at 501). If any possibility exists that the jury could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we may not overturn the verdict, even if we believe that the jury should not have

382

found Bohannon guilty. *See Poellinger*, 153 Wis. 2d at 507. Furthermore, "[a] conviction may be based in whole or in part upon circumstantial evidence." *State v. Hirsch*, 2002 WI App 8, ¶ 5, 249 Wis. 2d 757, 640 N.W.2d 140. Circumstantial evidence is often more probative than direct evidence; indeed, circumstantial evidence alone may be sufficient to convict. *Poellinger*, 153 Wis. 2d at 501.

¶ 31.   Bohannon argues that the evidence was insufficient to convict him of felony murder because there was insufficient evidence to prove the underlying felony —*i.e.*, that he was guilty of armed robbery. *See* WIS. STAT. § 943.32(2) (armed robbery); WIS. STAT. § 940.03 (listing armed robbery under § 943.32(2) as a felony that may underlie a felony murder charge). Bohannon argues that there was insufficient evidence to convict him of armed robbery because there was not enough evidence for the jury to conclude that he knew that Tatum was going to use a gun to rob Larson. *See State v. Chambers*, 183 Wis. 2d 316, 323–24, 515 N.W.2d 531 (Ct. App. 1994) (to be convicted of felony murder, a defendant need not have an intent to cause the death of a third party; "[o]nly intent to commit the underlying felony need be proved") (emphasis omitted; citation omitted). According to Bohannon, the evidence at trial instead showed that he merely planned and helped execute a robbery, *see* WIS. STAT. § 943.32(1), which is not one of the felonies that support a felony murder conviction, *see* § 940.03.

¶ 32.   In support of his contention, Bohannon references several pieces of evidence, including:   his statement to police that he changed his mind regarding the original plan and said that no guns were to be used to rob Larson; his statement that he did not know a gun was going to be used; and the fact that he did not see any guns when he dropped off Larson in the alley. Bohannon

also notes that there is no direct evidence that Tatum ever indicated that he planned to use a gun during the robbery.

■

¶ 33.   There is another view of the evidence, however, that would allow a rational trier of fact to find that Bohannon *did* know that Tatum was going to use a gun to rob Larson. As noted, the original plan had Tatum robbing both Larson and Bohannon using a gun. Although that plan was allegedly changed, the jury could have concluded that if Bohannon admitted to considering using a gun, he knew that Tatum was going to use one. In addition, Bohannon identified and accurately described the gun used in the shooting, and told police that they would find the gun with Tatum. The jury could have concluded that if Bohannon knew what the gun looked like and where it was after the robbery, he also knew that it was going to be used during the robbery. Also, immediately after learning that Larson had been shot, Bohannon called Tatum to find out where the money was and to negotiate his share. The jury could have concluded that if Bohannon was surprised that a gun was used, he would have said so in the phone call instead of merely focusing on acquiring his share of the proceeds. Finally, Bohannon was worried that Larson would run when Tatum would attempt to rob him. The jury could have concluded that Bohannon knew Tatum would bring a gun to ensure that Larson would not run.

¶ 34.   In sum, because sufficient evidence supports the verdict, we may not reverse Bohannon's conviction. *See Booker*, 292 Wis. 2d 43, ¶ 22; *Poellinger*, 153 Wis. 2d at 507.

*By the Court.*—Judgment and order affirmed.