STATE of Wisconsin, Plaintiff-Respondent,

v.

Raheem MOORE, Defendant-Appellant.†

Court of Appeals

*No. 2013AP127–CR. Submitted on briefs November 5, 2013.
—Decided January 14, 2014.*

2014 WI App 19

(Also reported in 846 N.W.2d 18.)

† Petition for Review granted May 22, 2014.

676

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Eileen A. Hirsch*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Daniel J. O'Brien*, assistant attorney general.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Raheem Moore appeals the judgment convicting him of second-degree reckless homicide, contrary to Wis. Stat. § 940.06(1) (2007–08).[1]

---

[1] All subsequent references to the Wisconsin Statutes are to the 2011–12 version unless otherwise specified.

Moore argues that the trial court erred in denying his motion to suppress his inculpatory statement "made eleven hours after he was arrested" because his confession was involuntary. Additionally, Moore argues that the trial court erred in denying his motion to suppress the unrecorded portion of the statement he made to police near the end of his interrogation as well as the recorded portion that immediately followed because the statements were inadmissible under WIS. STAT. § 938.195(2)(a) and *State v. Dionicia M.*, 2010 WI App 134, 329 Wis. 2d 524, 791 N.W.2d 236. We disagree and affirm.

## BACKGROUND

¶ 2. On October 10, 2008, Milwaukee Police interviewed then-fifteen-year-old Moore concerning the shooting death of James Parish. The first interview was conducted by Detectives Scott Gastrow and Charles Mueller and took place in the afternoon. The second interview was conducted by Detectives David Salazar and Paul Lough and took place in the evening. Because Moore takes issue with the length and substance of these interviews, we provide a detailed version of them below.

*A. Detectives Gastrow and Mueller interview Moore the afternoon of October 10, 2008.*

¶ 3. Shortly after noon on October 10, 2008, Milwaukee Police arrested Moore. At about 2:49 p.m., Detectives Gastrow and Mueller began interviewing Moore in an interrogation room at the police department's Criminal Investigation Bureau. The parties have not told us what occurred between the arrest and the commencement of the interview. What we do

know is that when the interview began, it was audio-recorded as required by *State v. Jerrell C.J.*, 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, and Wis. Stat. § 938.195(2)(a).

¶ 4. After eliciting basic background information from Moore—including his prior history with the juvenile justice system, the fact that he had initially given police a fake name and birthdate, and the fact that he had never been diagnosed with a learning disability—the detectives read Moore his *Miranda*[2] rights:

> [GASTROW]: . . . .Okay, now, how many times have you been read your rights before?
>
> MOORE: About two, three times.
>
> [GASTROW]: Did you understand them then?
>
> MOORE: Hmm-hmm.
>
> [GASTROW]: Okay, I'm going to read these from this card. Would you like to read along with me?
>
> MOORE: No, I don't.
>
> [GASTROW]: Here, read along with me as I read along . . . . You have the right to remain silent. Anything you say can and will be used against you in a court of law. Following, yes?
>
> MOORE: Yes.
>
> [GASTROW]: You have the right to consult with a lawyer before questioning and have a lawyer present with you during questioning. You understand that?
>
> MOORE: Yes.
>
> [GASTROW]: If you can not [sic] afford to hire a lawyer, one will be appointed to represent you at public expense before or during questioning if you so wish. Do you understand that?

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

MOORE: Yeah.

[GASTROW]: If you decide to answer questions now without a lawyer present, you have the right to stop the questioning at any time you wish and the right to ask for and to have a lawyer at any time you wish, including during questioning. Do you understand that?

MOORE: Yeah.

[GASTROW]: What does that mean in your own words?

MOORE: That mean like, if I'm talking to you all, then I don't want to say no more, I can just, um, don't say nothing.

[GASTROW]: Right.

MOORE: If at anytime you don't want to answer questions or if you say at some point you want your lawyer, you can do that.

[GASTROW]: But it's your option to tell us the truth about what happened here, okay.

MOORE: Yeah.

[MUELLER]: Or you can pick and choose if you say, well I'll answer that question but I don't want to answer that question, okay?

MOORE: Yeah.

[GASTROW]: Knowing these rights, do you mind if we ask you a few questions now[?] Is that okay with you?

MOORE: Yes.

¶ 5. Shortly thereafter, Moore admitted he was aware of a shooting in the neighborhood, as he was on a porch nearby when it happened, but denied any involvement. The detectives confronted Moore's denials

with what they claimed were statements from witnesses, including someone named Ronald Franklin, that Moore may have been involved. Moore said he knew Ronald Franklin, identified his photo, and admitted he told Ronald "that somebody had got shot and stuff." However, Moore said he did not recognize the photo of Ronald's brother, Raynard Franklin, and insisted he had never seen or heard of Raynard.

¶ 6. The detectives challenged Moore's denials and encouraged him to tell the truth. For example, when Moore said he did not know who shot the victim, Detective Gastrow responded, "you were one of two boys out there and that's very good information, that's not nobody guessing. That's the truth okay. We want you to tell us the truth." The detectives also speculated what might have happened; it could have been an intentional, cold-blooded shooting or an accident. They told Moore the case would be reviewed by the district attorney who might view it as an intentional shooting. When Moore said he was staying at his father's house, detectives confronted him with the fact that his father said he had not seen Moore in several days.

¶ 7. The detectives then showed Moore a photo of the victim and said the victim's family members were "besides themselves in grief," and that they deserved an explanation for what happened. The detectives also speculated that the family might forgive Moore. In response, Moore maintained: "I don't know who exactly who did it . . . it wasn't me." When the detectives asked whether Moore was "scared," Moore insisted there was nothing to be afraid of because he was not there, and no witness would identify him. Moore then asked who had told police he was involved. The detectives answered: "Tiawanna" and "Ronald." Moore responded, "That was a lie."

¶ 8. At this point, a break was taken from 4:02 p.m. to 4:30 p.m. Moore was allowed to use the bathroom, and, when he told the detectives he was hungry, they gave him two bologna sandwiches, a bag of Doritos, and water.

¶ 9. When the interview resumed at 4:30 p.m., Moore admitted, for the first time, his involvement in the shooting, explaining that he had gone along with a scheme hatched by a friend named "Jevonte." Moore explained that Jevonte wanted to commit a robbery for money and he (Moore) "was just part of it." When asked whether he had an active part in it, Moore answered, "Naw, [Jevonte] was going to do it. I was just part of it." When asked how he was part of it, Moore responded, "like party to a crime," and that he expected to share some of the robbery's proceeds.

¶ 10. Moore told the detectives that he and Jevonte decided to rob a man they saw making a purchase at a crack house. Moore pointed out on a map provided by Detective Mueller where he and Jevonte were at various points. He also provided a detailed physical description of Jevonte. Moore continued to deny knowing anything about Raynard Franklin, and insisted he was not covering for someone else. Moore claimed that Jevonte pressured him to be a lookout, saying, "You could really say he influenced me to do it."

¶ 11. Moore continued to describe the offense in detail. He explained how after the victim purchased drugs from the rear window of a crack house, Jevonte called the victim back, saying that someone wanted him at the window. When the victim returned, Jevonte pulled the gun and announced the robbery, but the victim turned, threw the drugs to the ground, and ran. A shot was fired, and Moore and Jevonte ran. According

to Moore, Jevonte told him he did not think he shot the man, and then the two split up. Moore returned to his friend Tiawanna's house. When an ambulance arrived thirty to forty minutes later, Ronald Franklin, Tiawanna, and several other girls came outside to the porch where Moore had been, asking what happened. Moore said he told them that someone got shot and that Jevonte shot him.

¶ 12. The detectives challenged this account of events. They claimed to have witness statements alleging that someone other than "Jevonte" was the shooter. Moore insisted it was Jevonte. He denied that it was Raynard Franklin. At this point, the audio-recording device cut off and the last few minutes of the interview went unrecorded.[3] The interview ended at 5:34 p.m., approximately two hours and forty-five minutes after it began.

### B. *Detectives Salazar and Lough interview Moore the evening of October 10, 2008.*

#### 1. *The first recorded portion of Salazar and Lough's interview: about 8:28 p.m. to 10:42 p.m.*

¶ 13. Moore's second interview, conducted by Milwaukee Detectives Salazar and Lough, began about three hours after the first interview ended, at 8:28 p.m.[4] When Salazar prepared to read *Miranda* warnings to

---

[3] Moore does not take issue with this technical malfunction on appeal.

[4] In his brief, Moore states that between the end of the first interview and the beginning of the second interview, he "remained in custody, alone . . . with the door open and was monitored by City of Milwaukee Police." The only citation Moore refers to for this information, however, is his motion to

Moore at the outset, Moore responded, "I know my rights." Salazar read the *Miranda* warnings anyway, and Moore expressly acknowledged his understanding after reading each separate right.

¶ 14. Much of the second interview involved taking Moore out to the scene of the crime and having him point out where events occurred. For the first time in the interview process Moore was handcuffed, with his hands in front of him, for security purposes. Moore proceeded to give directions to the crime scene, and, once they arrived, he pointed out various locations at the scene where he said people were positioned and events occurred.

¶ 15. Again Moore described being a lookout during the attempted robbery and subsequent shooting, which he claimed were committed by "Jevonte." Moore pointed out where Jevonte called out to the victim, and described the gun used: a small revolver with a large barrel. Moore insisted that Jevonte "peer pressured" him to be a lookout.

¶ 16. After visiting the scene, Salazar, Lough, and Moore went to a McDonald's drive-thru to order food, and continued to discuss the robbery and shooting. Salazar confronted Moore about "Jevonte," saying that nobody in the neighborhood knew him. Salazar also said that Moore's father said he had never met Jevonte. Moore responded that he probably had not. Salazar expressed the belief that Moore was covering for a friend because he was scared, and the situation was unfair considering that the friend was still free while

suppress, which contains no citation to the record. We remind counsel that WIS. STAT. RULE 809.19(1)(d) requires "appropriate references to the record"; citations to a motion or brief do not suffice. *See State v. Bean*, 2011 WI App 129, ¶ 24 n.5, 337 Wis. 2d 406, 804 N.W.2d 696.

685

Moore was in trouble because of him. Salazar encouraged Moore to be "a hundred percent truthful" because he was hurting himself by not being truthful, and assured Moore that police would do everything to protect him and his family.

¶ 17. After Salazar, Lough, and Moore returned to the police station, Moore took a break from questioning and ate dinner; then the interview resumed. Salazar again insisted police "knew" that Jevonte did not exist and asked why Moore was scared of the unidentified accomplice. Moore answered, "Cause he might try, he might try to kill me or something." The detectives again assured Moore they would protect him. Moore admitted he has known this individual for awhile. Salazar then asked, "Okay. What's his real name?"

¶ 18. At this point, Moore asked that the recorder be turned off. The detectives explained they needed the recorder on for their own protection from false claims of misconduct. The exchange proceeded as follows:

> MOORE: Ah you mind take that thing off?
>
> SALAZAR: What thing off?
>
> MOORE: Ah what you call it?
>
> SALAZAR: The recorder? Well the reason why we don't want the recorder turned off [is] because we don't want somebody . . . coming in here and saying that we beat you. Okay. You know what I mean? . . . . You know how in the movies where they take the phone book out and they beat people. Okay . . . .
>
> LOUGH: Are you worried that we would play that for him?
>
> MOORE: Hmm.
>
> LOUGH: No. We don't do that. Okay.
>
> SALAZAR: Okay. That recorder's there mainly

for my protection and my partner's protection. Now if you want it turned off because you asked for it, I will turn it off. But I just want to explain to you why it's on.

The recording device remained on.

¶ 19. Salazar again asked Moore who his accomplice was. Moore said it was Ronald Franklin's brother, Raynard Franklin. Moore admitted that he made up the name "Jevonte." Moore explained that Ronald threatened to kill him if he told on his brother. Moore also admitted he does not like telling on people, "[b]ut in this situation, I've got to." He then identified Raynard Franklin's photo. Moore said Raynard fired the fatal shot. When told that Raynard had accused Moore of firing the shot, Moore said Raynard was lying. Moore admitted that he had held the gun in the past, but had only "touched" it on the day of the shooting. Moore then said he—not Raynard—was the one who yelled to the victim to return to the window at the crack house and that Raynard fired the shot as he ran. Moore again denied Raynard's supposed accusation that Moore fired the shot. Salazar then announced he would go speak with the detectives whom he said were interviewing Raynard, but he would not play the tape for Raynard.

¶ 20. After Moore identified Raynard Franklin as the shooter, at about 10:07 p.m., he took a bathroom break. When the interview resumed at 10:20 p.m., Moore again described his and Raynard's roles in the robbery and shooting. Moore said this was his and Raynard's first robbery and he was the one who selected the victim. Moore again denied firing the gun.

2. *The unrecorded portion of the interview: about 10:42 p.m. to 11:17 p.m.*

¶ 21. At this point, just before 10:42 p.m., when Salazar asked if he could take a few notes, Moore asked

him a second time to turn off the recorder because he did not feel safe. Moore explained he was not afraid of police but of Raynard.

SALAZAR: You mind if I just take a few notes.

MOORE: What ah do you want ah like talk on there?

SALAZAR: You want me to turn that off?

MOORE: Yeah.

SALAZAR: Just tell me why you want me to turn this off?

MOORE: Cause I don't feel safe INAUDIBLE that.

SALAZAR: Okay. So you're asking me to turn it off. And you realize that we want to keep it on? Right? Yes, no? I need you to answer yes or no. How's that?

MOORE: Yes.

SALAZAR: Okay.

LOUGH: Who are you afraid of because of this? Us?

MOORE: Uh huh.

LOUGH: Who then?

MOORE: Raynard.

LOUGH: Raynard? Okay.

SALAZAR: So you realize that we're not asking you to turn it off? Okay. And we're not encouraging you to turn it off? Is that right?

MOORE: Mmm.

SALAZAR: Yes or no?

MOORE: Yes.

688

SALAZAR: Okay. The only reason you want us to turn it off is because it's your own choice? Is that right? Yes or no?

MOORE: Yes.

SALAZAR: Okay. Any other thing you need to put on this before I turn it off?

LOUGH: No. We're gonna turn it off at 10:42 p.m.

SALAZAR: And that's his request. Is that true?

MOORE: Yes.

¶ 22. The interview proceeded unrecorded. During the unrecorded portion, according to Salazar, Moore admitted for the first time that he, not Raynard, fired the fatal shot. This admission came at a point when Salazar was alone with Moore. After Moore told Salazar that he had disposed of his clothing and burned his shoes following the robbery and shooting, Salazar responded with words to the effect of "that was a lot of trouble" to be going to. Moore began to cry, and admitted that he was in fact the shooter. At 11:17 p.m., the detectives stopped the unrecorded interview to find out from their supervisor how to proceed. They decided to surreptitiously record the remainder of the interview by concealing a recorder in a manila envelope.

3. *The second recorded part of Salazar and Lough's interview*: about *11:20 p.m. to 11:44 p.m.*

¶ 23. Recording of the interview resumed at 11:20 p.m. For the next twenty-four minutes, Moore gave details about the robbery and shooting, including that he had thrown his clothing into a sewer and burned his shoes because he had fired the gun, that he fired the shot because he was scared and the victim "moved too

689

quick," and that afterward, upon returning to a friend's porch, he admitted telling Ronald Franklin he had fired the shot. Moore said he returned the gun to Raynard on the street after police left the area.

¶ 24. The interview ended at 11:44 p.m., and Moore was charged with first-degree reckless homicide. Moore filed a motion to suppress the unrecorded statement, as well as the recorded statement that immediately followed. His motion was denied.[5] Moore subsequently pled guilty to second-degree reckless homicide.[6] This appeal follows. Additional facts will be developed as necessary.

### ANALYSIS

¶ 25. Moore presents two arguments on appeal. He first argues that the trial court erred in denying his motion to suppress his inculpatory statement "made eleven hours after he was arrested" because his confession was involuntary. Additionally, Moore argues that the trial court erred in denying his motion to suppress the unrecorded statement he made to police at about 10:42 p.m. as well as the recorded statement that followed because the statements were inadmissible under WIS. STAT. § 938.195(2)(a) and *Dionicia M.*

A. *The trial court did not err in denying Moore's motion to suppress his inculpatory statement made eleven hours after he was arrested because the statement was voluntary.*

¶ 26. We turn first to Moore's argument that the trial court erred by denying his motion to suppress the

---

[5] The Honorable Jeffrey A. Conen denied Moore's motion to suppress.

[6] The Honorable David L. Borowski presided over Moore's guilty plea and entered the judgment of conviction.

inculpatory statement "made eleven hours after he was arrested."[7] Moore does not challenge any earlier statements in which he admitted involvement in the robbery and shooting.

*Standard of Review*

█

¶ 27. Moore argues that the trial court erred in denying his motion to suppress the aforementioned statement because he made it involuntarily. Whether Moore's statement was voluntary presents a mixed question of fact and law. *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 16. "We defer to the [trial] court's findings regarding the factual circumstances surrounding the statement." *Id.* We review independently "the application of constitutional principles to those facts." *Id.*

█

¶ 28. We evaluate the voluntariness of Moore's confession by examining "the totality of the circumstances surrounding that confession." *See id.*, ¶ 20. "[A] defendant's statements are voluntary 'if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist.' " *Id.*, ¶ 18 (citation omitted). In contrast, statements may be found involuntary if they are the product

---

[7] On appeal, Moore only challenges his statement made "eleven hours" after his arrest was improperly admitted. While Moore does not state exactly which statement fits this description in his brief, we presume, based on our review of the record, that he refers to the statements admitting that he—not "Jevonte" or Raynard Franklin—shot the victim.

of "coercive or improper police conduct." *See id.*, ¶ 19. Thus, we balance "the personal characteristics of the defendant against the pressures and tactics used by law enforcement officers." *See id.*, ¶ 20.

> The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as: the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*See id.* (citing *State v. Hoppe,* 2003 WI 43, ¶ 39, 261 Wis. 2d 294, 661 N.W.2d 407).

██

¶ 29. In evaluating the conduct of the police, we must keep in mind that no two situations are alike. " '[P]ressures that are not coercive in one set of circumstances may be coercive in another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures.' " *See Jerrell C.J.,* 283 Wis. 2d 145, ¶ 19 (citation omitted). Moreover, we must exercise "special caution when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult." *See id.*, ¶ 21 (citation and quotation marks omitted).

¶ 30. With these principles in mind, we turn to Moore's confession. We first examine Moore's relevant personal characteristics, including: his age; education and intelligence; physical and emotional condition; and prior experience with law enforcement. *See id.*, ¶¶ 19, 24. We then consider the pressures and tactics used by the police, including: whether Moore was informed of the right to counsel and right against self-incrimination; the length of the questioning; the general conditions under which the statements took place; and any excessive physical or psychological pressure, including any inducements, threats, methods or strategies used by the police to compel a response. *See id.*

*B. Moore's personal characteristics show his confession was voluntary.*

¶ 31. Considering Moore's age, we agree with Moore that being fifteen at the time he was questioned, just a year older than the juvenile defendant in *Jerrell C.J.*, *see id.*, ¶ 26, is a factor weighing against the voluntariness of his confession. As the supreme court noted in *Jerrell C.J.*, however, Moore's age alone is "not necessarily dispositive." *See id.* Rather, we must consider it in the context of the other facts we analyze. For example, the fact that Moore was fifteen years old at the time of questioning means we must scrutinize the detectives' questioning tactics more carefully "to determine if excessive coercion or intimidation or simple immaturity that would not affect an adult has tainted" Moore's confession. *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 26.

¶ 32. Moore's education and intelligence, on the other hand, support a conclusion that his statements were voluntary. Moore points to the fact that he was in

693

the eighth grade and had intelligence-test scores show-
ing him to be on "the low end of [the] borderline range
of intelligence." As the State points out, however, there
was also evidence that Moore deliberately underper-
formed on some of these tests, and he was not diag-
nosed with mental retardation or a learning disability.
He also had no mental health issues, and was merely
thought to have a behavioral disorder in which the
primary symptom was a propensity to "act out in an
unsocialized manner or contrary to authority." Addi-
tionally, as the State points out, Moore was undoubt-
edly "street smart," as exhibited by his ability to lie to
police about his name and to create his narrative about
"Jevonte." He also, as evidenced by his late-afternoon
admission to being "Jevonte's" accomplice, understood
the concept of party-to-a-crime liability. Furthermore,
as we have seen, Moore was able explain his *Miranda*
rights to police in his own words.

¶ 33. Moore's physical and emotional condition
also supports the conclusion that his confession was
voluntary. Moore does not address these factors. Our
review of the interview transcripts leads us to conclude
that Moore was physically and emotionally stable
throughout most of the interviews. Moore did cry when
admitting to having shot the victim; however, such an
emotional display is not unexpected. Additionally,
Moore had the benefit of two meals, beverages, multiple
bathroom breaks, and was questioned during the after-
noon and evening—times when a fifteen-year-old would
presumably be awake and not deprived of sleep (as
opposed to, for example, the middle of the night or very
early morning).

¶ 34. Finally, Moore's prior experience with law
enforcement supports the conclusion that his confes-
sion was voluntary. Moore had prior experience with

the juvenile justice system and, as we have seen, told police that he knew his rights. Furthermore, as we have already discussed, Moore was able to accurately state his rights in his own words.

¶ 35. In sum, while Moore's young age does weigh in his favor, the other factors that *Jerrell C.J.* instructs us to consider regarding Moore's personal characteristics lend considerable weight to a conclusion that Moore's confession was voluntary.

## C. *Police interrogation tactics also support a conclusion that Moore's confession was voluntary.*

¶ 36. Turning next to the conduct of police in providing Moore with his *Miranda* warnings, *see Jerrell C.J.*, 283 Wis. 2d 145, ¶¶ 19, 24, we conclude that police did an exemplary job of ensuring that Moore understood his rights. As noted, the first time the detectives read Moore his rights, they read the various portions of the *Miranda* warnings one at a time, and they paused between each part to ensure that Moore understood. Additionally, Detective Gastrow encouraged Moore to "read along" with him as he read Moore his rights. The detectives also asked Moore to restate some of the warnings in his own words—a practice we commend and encourage. The second time detectives read Moore his rights, they again went over each part of the *Miranda* warnings in detail, pausing to make sure that Moore understood. The detectives were very thorough, and our review of the interview transcripts shows that Moore did understand his rights.

¶ 37. As for the length of questioning, the interviews were certainly long, but did include several breaks for meals and visits to the restroom, and were not excessive under the circumstances. As demon-

strated, a large portion of the first interview was dedicated to obtaining Moore's background information: including his prior history with the juvenile justice system, the fact that he had initially given police a fake name and birthdate, and the fact that he had never been diagnosed with a learning disability. Moreover, much of the second interview involved taking Moore out to the scene of the crime and having him point out where events occurred. Furthermore, while Moore makes much of the fact that nearly three hours passed between his initial arrest and the start of questioning, he does not point to any portion of the record that would aid our understanding of the conditions of his confinement during this time. In addition, while approximately three hours passed between Moore's late-afternoon and evening interviews, Moore alleges that the interview room door was kept open in the time between interviews. Moore was not "handcuffed to a wall and left alone" before questioning began, as was the defendant in *Jerrell C.J. See id.*, 283 Wis. 2d 145, ¶ 6. Rather, the only time Moore was handcuffed was in the squad car traveling to and from the crime scene. Therefore, while Moore's interrogations were long, because they were not excessive under the circumstances we cannot conclude that the length of questioning weighs in either party's favor.

¶ 38. Examining next the general conditions of Moore's interviews, we conclude that they support the conclusion that his confession was voluntary. Moore focuses on the fact that detectives did not call his parents; however, our supreme court has declined to fashion a per se rule requiring parental consultation before a juvenile is questioned, *see id.*, ¶¶ 3, 43, and, as the State correctly points out, Moore never asked for his parents. During questioning, Moore explained that

he stayed with his father sporadically and that his mother was entering drug treatment. He made no indication that he wished to contact either of them. *Cf. id.*, ¶¶ 10, 42 (where police repeatedly rejected the defendant's requests to speak with his parents). Indeed, when detectives indicated they had spoken with Moore's father and that he had not heard of anyone named "Jevonte," Moore simply explained that his father probably did not know Jevonte. Additionally, we note that the interviews included numerous breaks, two breaks for full meals, and even cigarettes at certain points when Moore requested them. Moore was only handcuffed when in the squad car, and, according to his own account, was allowed to sit in the interview room with the door open between interviews. These general conditions differ greatly from the circumstances in *Jerrell C.J. See id.*, 283 Wis. 2d 145, ¶¶ 6, 8, 10.

¶ 39. Finally, in assessing the physical or psychological pressure used, we conclude that this factor also supports the conclusion that Moore's confession was voluntary. Moore points to a variety of tactics to support his argument to the contrary, including: isolating him in the interrogation room; repeatedly challenging his protestations of innocence; confronting him with incriminating evidence; minimizing his guilt, calling what happened an "accident," while maximizing the potential consequences; showing photos of the victim; and telling stories about his peers—in this case, a close friend nicknamed "Squeak," who got into trouble by lying to police. Moore argues that the techniques detectives used in his case were similar to those employed in the *Jerrell C.J.* case.

¶ 40. Contrary to Moore's framing of the confession, however, this was not an instance of a young defendant ultimately "cracking" under police pressure following hours of unrelenting, excessively manipulative interrogation. Rather, upon our independent review of the transcript, we agree with the State that Moore's interviews are more accurately described as "a frank give-and-take between experienced detectives and an experienced juvenile suspect . . . who knew all along he did not have to talk to police and could demand a lawyer." Moore did not, as he suggests on appeal, finally admit involvement after hours upon hours of police coercion. Instead, as we have seen, he admitted his involvement very early in the interview, explaining that "Jevonte" was the shooter and that he, Moore, was merely a "party" to the crime. Moore went to great lengths to convince police of this false version of events, providing vivid details regarding where he and "Jevonte" were during various points in time, and what was said to friends afterward. The detectives did not supply details for Moore that later became part of Moore's narrative, *cf. Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 748 (N.D. Ill. 2012) (interrogating officers providing details about crime to defendant); they simply said that they did not believe him. Furthermore, there is no indication that police officers raised their voices and frightened Moore in any way. *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 8.

¶ 41. In sum, for all of the foregoing reasons, we conclude that the trial court did not err in denying Moore's motion to suppress because his confession was in fact voluntary.

*D. The trial court did not err in denying Moore's motion to suppress his unrecorded statement or the recorded statement that followed.*

¶ 42. Moore next argues that the trial court erred in denying his motion to suppress the unrecorded statement he made to police after 10:42 p.m. because he did not "refuse to respond or cooperate" as is required for an unrecorded statement of a juvenile to be admissible under Wis. Stat. §§ 938.195(2)(a) & 938.31(3)(c)1. This is a question of law we review *de novo. See State v. Bohannon*, 2013 WI App 87, ¶ 18, 349 Wis. 2d 368, 835 N.W.2d 262. Moore further argues that because the unrecorded statement was inadmissible, the recorded statement that followed was inadmissible under *Dionicia M.*, 329 Wis. 2d 524, ¶¶ 3–4, 15–16 ("partially recorded" juvenile statements inadmissible under rule of *Jerrell C.J.*).

¶ 43. In *Jerrell C.J.*, the supreme court held that all custodial interrogations of juveniles must be electronically recorded "without exception when questioning occurs at a place of detention." *See id.*, 283 Wis. 2d 145, ¶ 3.

¶ 44. A few months after *Jerrell C.J.* was decided, the legislature codified this rule, creating Wis. Stat. § 938.195. *See* 2005 Wis. Act 60, § 27 (effective Dec. 31, 2005). Section 938.195, in its current form, provides, as relevant:

> **(2)** When required. (a) A law enforcement agency shall make an audio or audio and visual recording of any custodial interrogation of a juvenile that is conducted at a place of detention unless a condition under s. 938.31(3)(c)1. to 5. applies.

699

¶ 45. Under Wis. Stat. § 938.31(3)(c)1., an unrecorded statement may still be admissible if "[t]he juvenile refused to respond or cooperate in the custodial interrogation if an audio or audio and visual recording was made of the interrogation so long as a law enforcement officer or agent of a law enforcement agency made a contemporaneous audio or audio and visual recording or written record of the juvenile's refusal." This is exactly what happened in Moore's case.

¶ 46. Our review of the interview transcript leads us to conclude that Moore "refused to respond or cooperate in the custodial interrogation [when] an audio or audio and visual recording was made." *See id.* For ease of reference, we refer to the transcript again:

SALAZAR: You mind if I just take a few notes?

MOORE: What ah do you want ah like talk on there?

SALAZAR: You want me to turn that off?

MOORE: Yeah.

SALAZAR: Just tell me why you want me to turn this off?

MOORE: Cause I don't feel safe INAUDIBLE that.

SALAZAR: Okay. So you're asking me to turn it off. And you realize that we want to keep it on? Right? Yes, no? I need you to answer yes or no. How's that?

MOORE: Yes.

SALAZAR: Okay.

LOUGH: Who are you afraid of because of this? Us?

MOORE: Uh huh.

LOUGH: Who then?

MOORE: Raynard.

LOUGH: Raynard? Okay.

SALAZAR: So you realize that we're not asking you to turn it off? Okay. And we're not encouraging you to turn it off? Is that right?

MOORE: Mmm.

SALAZAR: Yes or no?

MOORE: Yes.

SALAZAR: Okay. The only reason you want us to turn it off is because it's your own choice? Is that right? Yes or no?

MOORE: Yes.

SALAZAR: Okay. Any other think you need to put on this before I turn it off?

LOUGH: No. We're gonna turn it off at 10:42 p.m.

SALAZAR: And that's his request. Is that true?

MOORE: Yes.

¶ 47. Contrary to what Moore argues, the transcript shows that this is not a case where he merely "expressed a preference" of having the recording turned off after detectives gave him the option of leaving it on or off. Rather, Moore broached the topic, and, as we have already seen, he did so on two separate occasions. Moore explained in no uncertain terms that he wanted the recording off because he feared for his safety; he was afraid of his accomplice, Raynard Franklin. Although Moore had been assured earlier that the police did not share interview recordings with alleged accomplices or the public generally, he still wanted the record-

ing device turned off. He was involved in a shooting, knew there would be consequences for the crime, and feared what might happen should Raynard find out that he told the police the truth. Moreover, the detectives took great care to ensure that Moore was affirmatively refusing to cooperate with having the recording turned off. Moore's words and actions in these circumstances constituted a "refusal." No magic words were required. *Cf. State v. Neitzel*, 95 Wis. 2d 191, 195–96, 289 N.W.2d 828 (1980) (defendant's insistence on waiting for his lawyer construed as refusal to take breathalyzer test); *State v. Rydeski*, 214 Wis. 2d 101, 106–07, 571 N.W.2d 417 (Ct. App. 1997) (defendant's conduct can constitute refusal to take breathalyzer test even when no verbal refusal given).

¶ 48. Therefore, because Moore refused to "respond or cooperate in the custodial interrogation [and] an audio or audio and visual recording was made," and because police "made a contemporaneous audio or audio and visual recording or written record of the juvenile's refusal," we conclude that his unrecorded statement and the recorded statement that followed were admissible. *See* Wis. Stat. § 938.31(3)(c)1. Consequently, the trial court did not err in denying Moore's motion to suppress.

*By the Court.*–Judgment affirmed.

¶ 49. KESSLER, J. (*concurring*). I write separately because I agree with the outcome of this case, but I disagree with the Majority's conclusion that, based on this record, Moore "refused to respond or cooperate" if police continued recording their interview with Moore. *See* Majority, ¶¶ 46–48. Rather, I conclude that the police officers violated the mandates of *Jerrell C.J.* and

Wis. Stat. § 938.31(3)(b)-(d) when they turned off the recording device; however, in light of other facts in the record, the violation was harmless.

¶ 50. The Majority correctly notes that our supreme court announced a prophylactic rule to protect the rights of juveniles during police interrogations when it stated in *Jerrell C.J.*: "All custodial interrogation of juveniles in future cases shall be electronically recorded where feasible, and without exception when questioning occurs at a place of detention." *See id.*, 283 Wis. 2d 145, ¶ 58; *see also* Majority, ¶ 43. Also as noted by the Majority, this rule was codified in Wis. Stat. § 938.31(3)(b)-(d). As pertinent here, § 938.31(3) provides:

> (b) Except as provided under par. (c), a *statement made by the juvenile during a custodial interrogation is not admissible* in evidence against the juvenile in any court proceeding alleging the juvenile to be delinquent *unless an audio or audio and visual recording of the interrogation was made as required under s. 938.195 (2)*[1] *and is available.*

> (c) A juvenile's statement is not inadmissible in evidence under par. (b) if any of the following applies or if other good cause exists for not suppressing a juvenile's statement under par. (b):

> 1. The juvenile refused to respond or cooperate in the custodial interrogation *if* an audio or audio and visual *recording was made* of the interrogation *so long as a law enforcement officer* or agent of a law enforce-

---

[1] Wisconsin Stat. § 938.195(2)(a) provides: "A law enforcement agency shall make an audio or audio and visual recording of any custodial interrogation of a juvenile that is conducted at a place of detention unless a condition under s. 938.31(3)(c)1. to 5. applies."

ment agency *made a contemporaneous* audio or audio and visual *recording or written record of the juvenile's refusal.*

. . . .

(d) Notwithstanding ss. 968.28 to 968.37, *a juvenile's lack of consent to* having an audio or audio and *visual recording made of a custodial interrogation does not affect the admissibility in evidence of an audio or audio and visual recording of a statement made by the juvenile during the interrogation.*

(Emphasis added.) The statute provides an exception to recording a juvenile interrogation if the juvenile refuses to respond or cooperate. In this case, Moore's verbal discomfort to the recording did not constitute a "refusal to cooperate." A reading of the colloquy provided by the Majority clearly indicates that Moore was uncomfortable with the recording device out of fear, but continued to talk to the interrogating officers after they assured him that the recording would not be played for Moore's accomplice. *See* Majority, ¶¶ 18, 19. The second time Moore expressed discomfort with the recording device was after Moore asked the officers "What ah do you want ah like talk on there?" *See* Majority, ¶ 21. Moore's question was answered with another question when Officer Salazar asked Moore: "You want me to turn it off?" Moore responded affirmatively. In the colloquy that followed, Moore never asked directly that the recorder be turned off, nor did he affirmatively state that he would not speak to the officers if the device remained on; rather, he just answered in the affirmative when the officers conducted a long series of leading questions about Moore's discomfort with the recording device. The obvious purpose of the questioning was to make a record that turning off the recorder was Moore's

704

idea, not the officers'. After Moore admitted that he was the shooter, the officers sought guidance from their supervisor as to how to proceed, and went on to secretly record Moore.

¶ 51. I conclude that this procedure runs contrary to the principles underlying *Jerrell C.J.* and WIS. STAT. § 938.31. A juvenile's right to the safeguards of a recorded interrogation can be waived only in limited circumstances—much like a criminal defendant's right to counsel. Whether a juvenile refuses to respond or cooperate is not ambiguous—either he refuses or he does not. Police officers should not guess or assume that a defendant is not cooperating to the extent that the officers have to seek guidance from their supervisors and then secretly record the defendant. Like the right to counsel, a demand to turn off a recording device stemming from a refusal to respond to questions or cooperate must be clear and unequivocal. Nothing in this text can fairly be considered an unambiguous refusal by Moore to continue the interview unless the recorder was turned off. Nor is there any explanation as to why police officers essentially gave Moore the right to choose whether to terminate recording an interrogation that our supreme court and the legislature mandated to be recorded.

¶ 52. *Jerrell C.J.*, WIS. STAT. § 938.195, and case law explaining that the right to counsel must be clear and unequivocal, *see Davis v. United States*, 512 U.S. 452 (1994), all stem from the same underlying principals that defendants have a constitutional right to protect themselves against self-incrimination. If police officers can decide, without unambiguous statements, that a juvenile defendant will not cooperate if a recording device is on, then the instituted safeguards protecting these defendants will be swallowed by a system that

allows officers to ask leading questions and create records to protect themselves while simultaneously disregarding the juvenile's constitutional rights.

¶ 53. Although I disagree with the Majority that the WIS. STAT. § 938.31(3)(b)-(d) exception applies here, I conclude that other facts in the record, namely, Moore's multiple lies, fabrications and admissions, support the denial of his motion to suppress. Accordingly, I agree with the outcome, but not with the entirety of the Majority's rationale.