# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP127-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |     Plaintiff-Respondent, |
| |   v. |
| | Raheem Moore, |
| |     Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 352 Wis. 2d 675, 846 N.W.2d 18)
(Ct. App. 2014 – Published)
PDC No.: 2014 WI App 19

| | |
|---|---|
| OPINION FILED: | June 16, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 23, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|  COURT: | Circuit |
|  COUNTY: | Milwaukee |
|  JUDGE: | David Borowski |

| | |
|---|---|
| JUSTICES: | |
|  CONCURRED: | ZIEGLER, J., ROGGENSACK C.J., concur. (Opinion Filed.) |
|  DISSENTED: | ABRAHAMSON, BRADLEY, JJ. Dissent. (Opinion Filed.) |
|  NOT PARTICIPATING: | |

ATTORNEYS:

  For the defendant-appellant-petitioner, there were briefs by *Eileen A. Hirsch*, assistant state public defender, and oral argument by *Eileen A. Hirsch*.

  For the plaintiff-respondent, the cause was argued by *Daniel J. O'Brien*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

An amicus curiae brief was filed by *Keith A. Findley*, *Wisconsin Innocence Project, Frank J. Remington Center at the University of Wisconsin Law School*, and *Steven A. Drizin*, *Laura H. Nirider*, *and Northwestern University School of Law*, on behalf of the Center on Wrongful Convictions of Youth.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP127-CR
(L.C. No. 2008CF5160)

STATE OF WISCONSIN    :    IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Raheem Moore,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**JUN 16, 2015**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals,[1] which affirmed a judgment convicting Raheem D. Moore (Moore) of second-degree reckless homicide as party to a crime.[2] Moore pled guilty to the charge

---

[1] State v. Moore, 2014 WI App 19, 352 Wis. 2d 675, 846 N.W.2d 18.

[2] Contrary to Wis. Stat. §§ 940.06(1) and 939.05. All subsequent references to the Wisconsin Statutes are to the 2007-08 version unless otherwise indicated.

after the Milwaukee County Circuit Court denied his motion to suppress certain statements he made during police questioning.[3]

¶2 This case presents issues related to our decision in State v. Jerrell C.J., 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, and the Wisconsin Legislature's subsequent enactment of Wis. Stat. § 938.195, which requires that custodial interrogation of juveniles be recorded except under limited circumstances. Moore contends that his confession to police was involuntary. Alternatively, he contends that the incriminating statements he made that were not recorded during his custodial interrogation as a juvenile were inadmissible because he did not "refus[e] to respond or cooperate" with detectives as required by an exception to the recording statute. Accordingly, he requests that he be allowed to withdraw his plea.

¶3 Moore, then 15 years old, was arrested on October 10, 2008, after being implicated in a Milwaukee homicide. Police detectives questioned Moore for approximately five and a half hours over a period of nine hours from 2:49 p.m. until 11:44 p.m.

¶4 On two occasions during this questioning, Moore asked the detectives to turn off the device recording his interrogation. After the detectives complied with Moore's second request, he confessed to being the shooter in the

---

[3] Judge David L. Borowski presided over the plea hearing and entered judgment. Judge Jeffrey A. Conen presided over the motion to suppress hearing.

2

homicide.    Thereafter, the detectives covertly recorded Moore reaffirming his confession.

¶5    Moore was initially charged with first-degree reckless homicide.    The circuit court held a <u>Miranda</u>[4]/<u>Goodchild</u>[5] hearing to review the voluntariness of Moore's statements made while the recording device was turned off as well as the voluntariness of his later statements that were covertly recorded.[6]    The circuit court determined that Moore had voluntarily waived his <u>Miranda</u> rights and was intelligent enough to request that the recording device be turned off.    Thus, Moore's statements were not suppressed.    Following this ruling, the State amended the charge to second-degree reckless homicide as party to a crime.    Moore pled guilty to the amended charge and was sentenced to 11 years of initial confinement and nine years of extended supervision.

¶6    Moore appealed the circuit court's decision on the admissibility of his statements.    The court of appeals ruled Moore's statements were voluntary.    It also concluded that Moore refused to cooperate with the detectives, which permitted them to turn off the recording device.

¶7    Moore successfully petitioned this court for review.

---

[4] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[5] <u>State ex rel. Goodchild v. Burke</u>, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

[6] Moore does not contend that the statements he made prior to 10:42 p.m.——the time at which the recorder was deliberately turned off——were involuntary.

¶8  We agree with the circuit court that Moore's statements were voluntary.  However, we conclude that Moore did not "refus[e] to respond or cooperate" with police during his interrogation.  Consequently, it was a violation of Wis. Stat. § 938.195 for police to cease recording the interrogation.

¶9   Nevertheless, the error, if any, in not suppressing some of Moore's statements, was harmless.  Moore admitted to participating in the crime prior to the recording device being turned off, and he repeated his unrecorded confession that he was the shooter after the device was turned back on.  Accordingly, we affirm the court of appeals.

I. FACTUAL AND PROCEDURAL BACKGROUND

¶10  Police responded to a reported homicide at 2626 North 23rd Street in Milwaukee at approximately 9:26 p.m. on October 8, 2008.  When officers arrived, they found James W. Parish (Parish) face down on the sidewalk.  He was pronounced dead at the scene.  An autopsy revealed that Parish was shot in his right flank, the bullet remained in his heart, and loss of blood from the gunshot wound caused his death.

¶11 Milwaukee Police Detective Christopher Blaszak interviewed Ronald Franklin (Ronald) on October 10, 2008. Ronald said that Moore came to his girlfriend's residence with Ronald's brother, Raynard Franklin (Raynard), after the shooting.  According to Ronald, Moore told him that he and Raynard had attempted to rob a victim and that Moore shot the victim when he became uncooperative.

4

¶12 Moore was arrested shortly after 12:00 p.m. that day and was questioned by two pairs of police detectives. The first pair, Scott Gastrow and Charles Mueller, began their questioning at 2:49 p.m. The second pair, Paul Lough and David Salazar, took over the interrogation at about 8:30 p.m. The interrogations were audio recorded, with the exception of the brief periods discussed below.

### A. 2:49 p.m.

¶13 Moore's interrogation took place on the fourth floor of the Criminal Investigation Bureau in Milwaukee. When Detectives Gastrow and Mueller began their questioning of Moore, they asked him basic questions about where he lived, his family, and his personal background, including his age, criminal history,[7] and education.[8] Detective Gastrow also asked Moore whether he had any mental or learning problems. Moore answered

---

[7] Moore told the Detectives that he had been arrested previously for possession of marijuana, possession of a dangerous weapon, and forgery.

[8] During this early questioning, the detectives asked Moore for his father's phone number and address, which Moore supplied. They also asked Moore about his mother. Moore indicated his mother was at Community Corrections for a drug addiction problem. Detectives also asked Moore whom they should contact in case of an emergency. Moore listed his father and aunt.

that he did not have mental problems and that he coped with his learning problems.[9]

¶14  Detectives Gastrow and Mueller furnished Moore with a written copy of his Miranda rights.  They read him his rights one at a time and stopped to ask him if he understood each right.  During this colloquy, Detective Gastrow also asked Moore to explain the right to end questioning without a lawyer.  Moore stated, "That mean like, if I'm talking to you all, then I don't want to say no more, I can just, um, don't say nothing."[10]

¶15  After the detectives read Moore his Miranda rights, he agreed to talk to them.  The detectives asked Moore about what happened on October 8.

¶16  Initially, Moore told the detectives that he was not involved in the shooting.  He told them that he had been on Ronald's girlfriend's porch at the time of the shooting.  When the detectives told Moore that witnesses said otherwise, Moore changed his story and said that he had been walking near the porch with three friends when he heard the gunshot.  Again, the

---

[9] Doctor David W. Thompson (Dr. Thompson), a child psychologist, testified on Moore's behalf at the Miranda/Goodchild hearing.  Dr. Thompson was concerned with Moore's confession based on his age, functionally low IQ, and Attention Deficit Hyperactivity Disorder.  Moore's IQ tests indicated he was in a "borderline range of intellectual functioning."

[10] Detective Gastrow testified at a later hearing that Moore appeared to understand his Miranda rights.

detectives challenged Moore's story, but Moore insisted that he was not involved in the shooting.

¶17 The detectives showed Moore a photo array that included both Ronald and Raynard Franklin and asked Moore who "Jevonte" was.[11] Moore identified Ronald, but indicated that he did not know Raynard. Moore also said that he knew someone named Jevonte, but did not see him pictured in the array.

¶18 The detectives took a break from the interrogation at 4:02 p.m. They allowed Moore to use the restroom and provided him with bologna sandwiches, a bag of chips, and water. The break ended at 4:30 p.m.

¶19 After the break, Moore admitted some involvement in Parish's death. Moore said he was with someone named Jevonte, but that Jevonte was not in the photo array he had been shown. Moore claimed that Jevonte shot Parish after robbing him, but that Moore was "just part of it" as a "party to a crime." Moore said he was supposed to get some of the money from the robbery.

¶20 Moore provided the detectives with a detailed story of the shooting, including the location, his position at the scene, the type of gun used, and the fact that the victim was purchasing drugs from the back window of a house. He stated

---

[11] Moore was arrested after police interviewed Ronald Franklin. The record is not clear whether the detectives obtained the name "Jevonte" from some source like Franklin, or whether the detectives hypothesized the name as a technique in interrogation. See ¶¶31, 34, infra.

that the robbery had been Jevonte's idea and that Jevonte had provided the gun.

¶21  Moore said that, although he did not see Jevonte fire the gun, he did see the flash of the gun when Jevonte fired it. He stated that after the gunshot, he and Jevonte fled the scene. According to Moore, he met up with Jevonte a short time later, then went to Ronald's girlfriend's house.

¶22  Moore also provided specific details about Jevonte, saying that he was 15 or 16 years old[12] and five feet ten inches tall with a medium build.  However, Moore could not provide the detectives with Jevonte's last name, where he lived, what school he went to, whether he had brothers, his mother's name, or his phone number.

¶23  Moore admitted that his earlier stories were lies. Still, the detectives challenged Moore's new story, suggesting——among other things——that Moore could not have seen the flash of the gun from where he claimed to have been standing.  The detectives also told Moore that Ronald and others had named someone else as the shooter; Moore told them that Ronald and the others did not know Jevonte.

---

[12] Later, Moore stated that Jevonte was 18 or 19 years old.

¶24  The recording ceased at approximately 5:15 p.m. due to a malfunction.[13]  Detectives Gastrow and Mueller ended their questioning at approximately 6:00 p.m.

### B. 8:28 p.m.

¶25  Detectives David Salazar and Paul Lough began to question Moore at 8:28 p.m.  Detective Salazar asked Moore whether he would be willing to go to the crime scene with them, and Moore agreed.  Detective Salazar read Moore his <u>Miranda</u> rights again and Moore indicated he understood.

¶26  At approximately 8:39 p.m., Moore and the detectives left for the crime scene.  Detective Salazar sat in the back seat of a police vehicle with Moore, and Detective Lough drove.

¶27  Moore directed them to the crime scene.  During the drive, Detective Salazar asked Moore about school, his favorite classes, and potential career paths after high school.  When they arrived at the scene, Moore explained his story of what happened.  Moore said that Parish had walked down an alley and crossed a gangway.  Moore stated he was at the mouth of the alley while Jevonte was in the yard near Parish.  According to Moore, Jevonte called to Parish, telling him that "somebody wanted him at the window" of the house where Parish had purchased drugs.  Moore said that Jevonte then shot Parish.

---

[13] At the suppression hearing, the parties agreed that "malfunctions happen from time to time, it was not done purposefully and was not actually known until after the fact." Moore does not suggest that the malfunction implicates the admissibility of his statements.

9

¶28  After the shooting, Moore said, they ran west down the alley and crossed 23rd Street and made it to 24th Street. Eventually, Moore and Jevonte separated.  Moore went to Ronald's girlfriend's house, while Jevonte went home.

¶29  Detective Salazar asked Moore why people in the neighborhood did not know Jevonte.  Moore suggested that those people were lying.  Detective Salazar pointed out that Moore's father also said he never met Jevonte, which Moore said was probably true.[14]

¶30  Moore was given time to eat dinner under the supervision of police officers.  The interrogation resumed at 9:47 p.m.

¶31  Detective Salazar told Moore that police knew Jevonte was not real and that Moore had already been identified as being at the crime scene.  Moore responded that he was worried the other person involved "might try to kill [him] or something." Detective Salazar assured Moore that no one would kill him.

¶32  At this point, Moore asked that the recorder be turned off:

MOORE:    Ah you mind take that thing off.

SALAZAR:  What thing off?

MOORE:    Ah what you call it?

---

[14] Although Moore had provided his father's phone number earlier in the day, it is unclear whether or to what extent police actually contacted him.

10

SALAZAR: The recorder? Well the reason why we don't want the recorder turned off [is] because we don't want somebody . . . coming in here and saying that we beat you. Okay. You know what I mean? That we did . . . any misconduct. You know what I'm saying? You know how in the movies where they take the phone book out and beat people? Okay. . . . You've seen the movies[,] right[?]

LOUGH: Are you worried we would play that for him?

MOORE: Hmmm.

LOUGH: No. We don't do that. Okay.

SALAZAR: Okay. That recorder's there mainly for my protection and my partner's protection. Now if you want it turned off because you asked for it, I will turn it off. But I just wanted to explain to you why it's on.

MOORE: Hmm.

SALAZAR: Okay. It's completely up to you. But that is why it's there. Okay.

¶33 Despite Detective Salazar's invitation to turn off the recorder at Moore's request, Moore did not make that request. The detectives did not turn off the recorder, and the interrogation continued.

¶34 Moore then told the detectives that Raynard was involved, not Jevonte. Moore said he had gotten the name "Jevonte" from the detectives he spoke to earlier. Moore said that Ronald threatened to kill him if he told police that Raynard was involved.

¶35 Moore said that Raynard had the gun, and Moore conceded that he had held it on October 8 and 9. Moore also admitted he was in the backyard of the house where Parish was purchasing drugs, but maintained that he left the backyard when

11

Raynard called Parish back to the window.  Moore then changed his story again and admitted that he had called Parish back to the window.  Moore explained that Parish had come back to the window, then Parish ran and Raynard shot him.  Moore continued to deny that he shot Parish or had the gun.

¶36  Detectives took a break and stopped the recording at 10:07 p.m.  The interrogation and recording resumed at 10:20 p.m.

¶37  After the break, the detectives asked Moore to explain again how the events unfolded.  Moore again provided a detailed account.  He stated that he had lured Parish back to the window where Parish had just purchased drugs, but maintained that he had not fired the gun.

¶38  Then Moore mentioned the recorder again:

MOORE:    What ah do you want ah like talk on there?

SALAZAR: You want me to turn that off?

MOORE:    Yeah.

SALAZAR: Just tell me why you want me to turn this off?

MOORE:    Cause I don't feel safe [INAUDIBLE] that.

SALAZAR: Okay.  So you're asking me to turn it off. And you realize that we want to keep it on.  Right? Yes, no?  I need you to answer yes or no.  How's that?

MOORE:    Yes.

SALAZAR: Okay.

LOUGH:    Who are you afraid of . . . ?  Us?

MOORE:    Uh huh.

12

LOUGH:     Who then?

MOORE:     Raynard.

LOUGH:     Raynard?  Okay.

SALAZAR: So you realize that we're not asking to turn it off?  Okay.  And we're not encouraging you to turn it off?  Is that right?

MOORE:     Mmm.

SALAZAR: Yes or no?

MOORE:     Yes.

SALAZAR: Okay.  The only reason you want us to turn it off is because it's your own choice?  Is that right?  Yes or no.

MOORE:     Yes.

SALAZAR: Okay.  Any other things you need to put on this before I turn it off?

LOUGH:     No.  We're gonna turn it off at 10:42 PM.

SALAZAR: And that's at his request.  Is that true?

MOORE:     Yes.

¶39  At this time, the detectives turned off the recorder.

### C. 11:20 p.m.

¶40  At 11:20 p.m., the recording resumed.  Detective Salazar began the recording by saying——outside the interrogation room——that Moore had just "admitted he was the shooter and that he didn't want Raynard to get in trouble for what he did and that he explained why he shot and how it made him feel and everything . . . ."  Detective Salazar then concealed the recorder in an envelope and took it into the interrogation room.

13

¶41 On the recording, Moore indicated he was scared earlier and lied about not shooting Parish. Moore explained that he shot Parish because "he moved too quick and stuff." Moore told the detectives he "didn't shoot to kill, [he] tried to hit him," and that he turned his head away when he shot.

¶42 Moore said that he and Raynard ran away from Parish after the shooting and met at 24th Street. At 24th Street, the two separated, Moore went to Ronald's girlfriend's house, and he told Ronald about what happened. Moore said he returned the gun to Raynard later on October 8.

¶43 The detectives asked Moore if he was telling the truth, and Moore replied that he was. The recording ended at 11:44 p.m.[15]

### D. Proceedings In Court

¶44 On October 13, 2008, Moore was charged with first-degree reckless homicide, contrary to Wis. Stat. § 940.02(1). On October 15, Moore's initial appearance was held before Circuit Court Commissioner Kevin Costello, who set cash bail at $100,000. On December 1, a preliminary hearing was held in criminal court before Circuit Court Judge Glenn H. Yamahiro.

---

[15] At no time during the interrogation did Moore request to speak to either of his parents.

14

Judge Yamahiro found probable cause for the charge and bound the case over for trial.[16]

¶45  On December 10, 2010, a suppression hearing was held before Judge Jeffery Conen based on Jerrell C.J., 283 Wis. 2d 145, and Wis. Stat. § 938.195.  Detective Salazar testified about Moore's request to turn off the recording device during part of his interrogation because of Moore's fear of retaliation.  Detective Salazar explained that while the recorder was turned off, Moore told him that he shot Parish. After Moore's confession, they took a break, then covertly brought the recorder back into the interrogation room.

¶46  On cross-examination, Detective Salazar indicated he was alone with Moore when he confessed.  After this confession, Detective Salazar spoke with his supervisor about the possibility of a covert recording, as the Department had not previously encountered such a situation.  Detective Salazar stated his rationale for making the covert recording: "I didn't want to be accused of all kinds of nonsense, to be honest with you."

¶47  On January 24, 2011, Judge Conen found that the request to turn off the recorder came from the defendant, and "it came from the defendant twice."  "[A] reasonable person could view the actions and statements of Mr. Moore as a request

---

[16] Between the December 1, 2008, preliminary hearing and the December 10, 2010, suppression hearing, there were multiple proceedings including an unsuccessful challenge to Moore's competency and an unsuccessful reverse waiver hearing.

15

to turn off the recording device before he wanted to go further with some discussion about certain aspects of the case."

¶48 Judge Conen ruled that Moore's first request to turn off the recorder was not a refusal because Moore continued to talk. He reasoned, however, that because Moore was making the request a second time, the detectives may have thought Moore would not answer their questions with the recorder on. Therefore, the court determined there was a proper refusal and denied Moore's suppression motion.

¶49 On December 6, 2011, a plea hearing was held before Circuit Judge David Borowski after the State filed an amended information reducing the charge from first-degree reckless homicide to second-degree reckless homicide as party to a crime. Moore's plea agreement with the State was that there would be no presentence investigation, the victim's family would be allowed to speak at sentencing, the State would anticipate recommending a maximum prison term and restitution, the defendant would submit to the court's criminal jurisdiction, and the defendant would not seek alterations based on his juvenile status. Moore pled guilty to the amended charge. Judge Borowski accepted the plea, finding that it was freely, knowingly, intelligently, and voluntarily given.

¶50 On February 17, 2012, Judge Borowski sentenced Moore to 11 years of initial confinement and nine years of extended supervision. The court also required Moore to pay restitution in the amount of $2,583.00. Moore was credited with 1,226 days of presentence incarceration.

¶51 Moore appealed his conviction on grounds that his incriminating statements to police should have been suppressed. The court of appeals affirmed the circuit court, concluding that Moore refused to cooperate based on his two requests to turn off the recording device.  State v. Moore, 2014 WI App 19, ¶¶46-48, 352 Wis. 2d 675, 846 N.W.2d 18.   The court also concluded that Moore's statements were voluntary based on his previous encounters with police, his ability to concoct the fake Jevonte story, and his ability to comprehend "party to a crime" liability.  Id., ¶32.

## II. STANDARD OF REVIEW

¶52 We must determine the voluntariness of Moore's statements to police.  Whether Moore's statements were voluntary is a question of constitutional fact.  Our review of questions of constitutional fact follows a two-step analysis.  State v. Jennings, 2002 WI 44, ¶20, 252 Wis. 2d 228, 647 N.W.2d 142 (citing State v. Henderson, 2001 WI 97, ¶16, 245 Wis. 2d 345, 629 N.W.2d 613).  First, we accept the circuit court's findings of fact unless they are clearly erroneous.  Id.  Second, we independently apply constitutional principles to those facts. Id.

¶53 This case also requires us to interpret Wisconsin statutes relating to recording the interrogation of juveniles. We interpret statutes de novo, without deference to the circuit court and court of appeals.  State v. Lindsey A.F., 2003 WI 63, ¶8, 262 Wis. 2d 200, 663 N.W.2d 757 (citing State v. Setagord, 211 Wis. 2d 397, 405-406, 565 N.W.2d 506 (1997)).

17

¶54 Finally, this case requires us to determine whether the error, if any, in the circuit court's decision not to suppress Moore's statements, was harmless. Whether an error is harmless is a question of law that this court reviews de novo. Weborg v. Jenny, 2012 WI 67, ¶43, 341 Wis. 2d 668, 816 N.W.2d 191.

## III. ANALYSIS

### A. Voluntariness of Confession

¶55 A defendant's confession must be voluntary; the State's use of an involuntary confession for purposes of prosecution violates the defendant's due process rights. See Jerrell C.J., 283 Wis. 2d 145, ¶17; Rogers v. Richmond, 365 U.S. 534, 540 (1961). A defendant's confession is voluntary if it is "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." State v. Lemoine, 2013 WI 5, ¶17, 345 Wis. 2d 171, 827 N.W.2d 589 (citing State v. Hoppe, 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407). The government bears the burden of establishing——by a preponderance of the evidence——that a confession was voluntary. State v. Agnello, 226 Wis. 2d 164, 179-80, 593 N.W.2d 427 (1999) (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)).

¶56 Voluntariness is evaluated in light of all the circumstances surrounding interrogation and decided under a totality of the circumstances, weighing the suspect's personal

18

characteristics[17] against the actions of the police. Lemoine, 345 Wis. 2d 171, ¶18 (citing Hoppe, 261 Wis. 2d 294, ¶38). "[I]n order to justify a finding of involuntariness, there must be some affirmative evidence of improper police practices deliberately used to procure a confession." State v. Clappes, 136 Wis. 2d 222, 239, 401 N.W.2d 759 (1987). In other words, a suspect's personal characteristics alone cannot form the basis for finding that the suspect's confessions, admissions, or statements are involuntary.

¶57 We review police conduct for, among other things, "the length of questioning, general conditions or circumstances in which the statement was taken, whether any excessive physical or psychological pressure was used, and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant." State v. Ward, 2009 WI 60, ¶20, 318 Wis. 2d 301, 767 N.W.2d 236 (quoting State v. Davis, 2008 WI 71, ¶37, 310 Wis. 2d 583, 751 N.W.2d 332). The age of the suspect may affect how we view police tactics; "the younger the child the more carefully we will scrutinize police questioning tactics to determine if excessive coercion or intimidation or simple immaturity that would not affect an adult has tainted the juvenile's confession." Jerrell C.J., 283

---

[17] "The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." State v. Hoppe, 2003 WI 43, ¶39, 261 Wis. 2d 294, 661 N.W.2d 407 (citations omitted).

19

Wis. 2d 145, ¶26 (quoting Hardaway v. Young, 302 F.3d 757, 765 (7th Cir. 2002)).   When a suspect is a juvenile, "special caution" must be taken with the methods of interrogation used when "a parent, lawyer, or other friendly adult" is not present. Id., ¶21 (quoting Hardaway, 302 F.3d at 762).

¶58 We begin, as the court of appeals did, with Moore's personal characteristics.   At the time of questioning, Moore was 15 years old.   He attended eighth grade at Travis Academy in Milwaukee.   He indicated to police that he did not have any mental problems, had never attempted suicide, and coped with whatever learning problems he had.   When asked whether he was sick or under the influence of drugs or alcohol, Moore stated that he was not.

¶59 Moore's answers in early questioning also indicated that he had a significant amount of prior police interaction. Moore told police that he had been arrested previously for possession of marijuana, forgery, and possession of a dangerous weapon.   Moore said he was on probation for the dangerous weapon charge and provided police with the name of his probation agent.

¶60 Although Moore was only 15 years old at the time of his questioning, he had more experience with police and law enforcement than most people his age.   Moore demonstrated that he was able not only to develop a story about his non-involvement in the shooting but also to adapt the details of that story to information——either true or untrue——possessed by the police.   For example, when detectives suggested that "Jevonte's" age did not make sense, Moore changed it from

20

between 15 and 16 to between 18 and 19.   When they asked why nobody in the neighborhood knew "Jevonte," Moore said that those people either did not know him or were lying.   When detectives told Moore that he would not have been able to see the flash of the gun from where he claimed to be standing, he changed his supposed position at the crime scene.

¶61   In sum, Moore's ability to concoct and modify a story "on the fly" suggests a level of sophistication and adaptability perhaps not accounted for by a standard IQ test.[18]   Thus, his below-average intellect "does not justify a conclusion that [his] mental condition, by itself and apart from its relation to official coercion, should . . . dispose of the inquiry into constitutional 'voluntariness.'"   Colorado v. Connelly, 479 U.S. 157, 164 (1986).   Rather, it must be taken into consideration and weighed against the conduct of police.

¶62   The tactics used by the detectives interrogating Moore do not suggest that his confession was involuntary.   Although Moore was with police for nearly 11 hours after his arrest, his interrogation took place over shorter periods of time with breaks for food, trips to the restroom and the crime scene, and a shift change.   Moore's actual questioning lasted about five and a half hours.

---

[18] "IQ test scores are approximations of conceptual functioning, but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks."   American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 37 (5th ed. 2013).

21

¶63 Additionally, Moore was read his Miranda rights at least twice. Early on, Moore indicated to the detectives that he was aware of his Miranda rights and had read them two or three times in the past. Nevertheless, the detectives informed Moore of each of his rights separately and waited for Moore to verify that he understood. Moore also was furnished with a written copy of his rights as the warnings were read to him. Moore explained his right to end questioning to detectives.

¶64 It is true that the detectives used tactics such as minimizing, suggesting that Parish's death may have been an accident, and telling Moore that other witnesses were saying he shot Parish, to elicit a confession from him. Although these tactics may have influenced Moore, they are tactics that courts commonly accept. E.g. State v. Triggs, 2003 WI App 91, ¶¶15-17, 264 Wis. 2d 861, 663 N.W.2d 396 (citation omitted). See also 2 Wayne R. LaFave et al., Criminal Procedure § 6.2(c), at 629-36 (3d ed. 2007).

¶65 We conclude that Moore's confession was voluntary because the pressures placed on him by interrogation did not "excee[d his] ability to resist." Lemoine, 345 Wis. 2d 171, ¶17. The detectives took care to ensure that Moore understood his Miranda rights. They fed him, gave him water, took breaks, and treated him with decency and respect. Moore's age and intellectual capacity, while significant, are not dispositive. Thus, although the detectives persuaded Moore to confess that he

shot Parish, Moore's decision to do so was a voluntary decision.[19]

### B. Interpretation of Recording Statutes

¶66 We now turn to the issue of whether, under the relevant Wisconsin statutes, Moore's questioning should have been recorded in its entirety. We look to Wis. Stat. § 938.195 to determine whether, and to what extent, the statutory protections that require the recording of juveniles apply here.

¶67 This court held in Jerrell C.J. that a juvenile's custodial interrogation must be recorded. Jerrell C.J., 283 Wis. 2d 145, ¶¶57-58. The court said: "All custodial interrogation of juveniles in future cases shall be

---

[19] Although the parties discussed at some length the absence of Moore's father during the interrogation, the record contains no express allegation that there was a violation of Wis. Stat. § 938.19(2) ("Notification of Parent, Guardian, [or] Legal Custodian") in this case. In fact, the record supports at least a circumstantial determination that police did contact Moore's father. Short of a violation of Wis. Stat. § 938.19(2) or some evidence that police purposefully cut Moore off from his parent or another "friendly adult" in order to secure a confession, we hesitate to say that Moore's father's absence can be considered an "improper police practice" to be weighed against his personal characteristics. Thus, although we take Moore's father's absence into account as a part of the totality of the circumstances surrounding Moore's confession, his absence does not change the outcome.

The Center on Wrongful Convictions of Youth and the Wisconsin Innocence Project, as amicus, ask us to adopt a per se rule excluding statements made by juveniles when they are denied the opportunity to consult with a parent or other friendly adult. In Jerrell C.J., we were asked to adopt a similar rule. We declined to do so in Jerrell C.J., 283 Wis. 2d 145, ¶59, and we decline to do so here.

electronically recorded where feasible, and without exception when questioning occurs at a place of detention." Id., ¶58.

¶68 The legislature appeared to codify this holding as part of 2005 Wis. Act 60, which was approved subsequent to the Jerrell C.J. decision.   The Act created Wis. Stat. § 938.195, which reads, in part, as follows:

> (2)  WHEN REQUIRED. (a) A law enforcement agency shall make an audio or audio and visual recording of any custodial interrogation of a juvenile that is conducted at a place of detention unless a condition under s. 938.31(3)(c)1. to 5. applies.
>
> (b)  If feasible, a law enforcement agency shall make an audio or audio and visual recording of any custodial interrogation of a juvenile that is conducted at a place other than a place of detention unless a condition under s. 938.31(3)(c)1. to 5. applies.
>
> 3.  NOTICE NOT REQUIRED.  A law enforcement officer or agent of a law enforcement agency conducting a custodial interrogation is not required to inform the subject of the interrogation that the officer or agent is making an audio or audio and visual recording of the interrogation.

¶69 Act 60 also amended Wis. Stat. § 938.31, creating subsection (3) to implement the above-stated directive. Subsection (3) reads in part:

> (b)  Except as provided under par. (c), a statement made by the juvenile during a custodial interrogation is not admissible in evidence against the juvenile in any court proceeding alleging the juvenile to be delinquent unless an audio or audio and visual recording of the interrogation was made as required under s. 938.195(2) and is available.
>
> (c)  A juvenile's statement is not inadmissible in evidence under par. (b) if any of the

24

following applies or if other good cause exists for not suppressing a juvenile's statement under par. (b):

> 1.    The juvenile refused to respond or cooperate in the custodial interrogation if an audio or audio and visual recording was made of the interrogation so long as a law enforcement officer or agent of a law enforcement agency made a contemporaneous audio or audio and visual recording or written record of the juvenile's refusal.

Wis. Stat. § 938.31(3)(b)-(c) (emphasis added).

¶70  Act 60 also created Wis. Stat. § 968.073 in the chapter entitled "Commencement of Criminal Proceedings." Section 968.073 deals with "Recording custodial interrogations." This section somewhat parallels Wis. Stat. § 938.195(2), but it is not nearly as comprehensive. Section 968.073(2) reads:

> (2)  It is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony unless a condition under s. 972.115(2)(a)1. to 6. applies or good cause is shown for not making an audio or audio and visual recording of the interrogation.

¶71  Wisconsin Stat. § 972.115(2)(a)1. reads:

> 1.    The person refused to respond or cooperate in the interrogation if an audio or audio and visual recording was made of the interrogation so long as a law enforcement officer or agent of a law enforcement agency made a contemporaneous audio or audio and visual recording or written record of the subject's refusal.

¶72  Notably, Wis. Stat. § 972.115(2)(a) provides a remedy for a recording violation that is different from the remedy in Wis. Stat. § 938.31(3)(b).  It provides:

> If a statement made by a defendant during a custodial interrogation is admitted into evidence in a trial for a felony before a jury and if an audio or audio and

25

visual recording of the interrogation is not available, upon a request made by the defendant as provided in s. 972.10 (5) and unless the state asserts and the court finds that one of the following conditions applies or that good cause exists for not providing an instruction, the court shall instruct the jury that it is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony and that the jury may consider the absence of an audio or audio and visual recording of the interrogation in evaluating the evidence relating to the interrogation . . . .

Wis. Stat. § 972.115(2)(a).

¶73 These several statutes present two questions in relation to this case:

1.   Did Moore refuse to respond or cooperate with detectives in his custodial interrogation if the detectives did not discontinue the audio recording of the interrogation? Moore's refusal would justify the officers turning off the recorder.

2.   If Moore did <u>not</u> refuse to respond or cooperate in his custodial interrogation, were the statements he provided to police during the time he was not being recorded inadmissible against him in a criminal proceeding?

¶74 These questions present issues of statutory interpretation.

¶75 Interpreting a statute requires us to "faithfully give effect to the laws enacted by the legislature . . . ." <u>State ex rel. Kalal v. Circuit Court for Dane Cnty.</u>, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Words and phrases in the statute are given their "common, ordinary, and accepted meaning" unless

26

they are technical or defined in the statute. Id., ¶45. We also consider "the scope, history, context and purpose of the statute" as a part of this plain-meaning analysis. Id., ¶48 (quoting State ex rel. Cramer v. Schwarz, 2000 WI 86, ¶18, 236 Wis. 2d 473, 613 N.W.2d 591).

¶76 Normally, if our analysis finds a plain meaning in the language of the statute, the inquiry ends there. Id., ¶46. Normally, we are "not at liberty to disregard the plain, clear words of the statute." Id. (quoting State v. Pratt, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)). If, on the other hand, the statute is ambiguous we may examine extrinsic sources, such as legislative history. Id., ¶¶47, 50.

¶77 In this case, the statute is not ambiguous. Thus, interpretation of the phrase "refused to respond or cooperate" represents an ordinary case of statutory interpretation. With respect to the remedy for a violation of the statute, however, we are presented with a dilemma. A literal reading of the statute appears to undermine the purpose of the statute for juveniles who are prosecuted in adult criminal court and to produce a result that is in direct contravention of this court's ruling in Jerrell C.J.

¶78 We address first the question of whether Moore refused to respond or cooperate.

¶79 Neither Wis. Stat. § 938.31 nor Wis. Stat. § 938.195 defines "refused." We therefore consider the commonly accepted definition of the word. "Refuse" may be defined as "to express oneself as unwilling to accept . . . [or] to show or express

27

unwillingness to do or comply with something . . . ." Webster's New Collegiate Dictionary 972 (5th ed. 1977). A "refusal" is "The denial or rejection of something offered or demanded." Black's Law Dictionary 1285 (7th ed. 1999).

¶80 A suspect who "refuse[s] to respond or cooperate" must do more than request or express a preference that a recording device be turned off. Rather, the plain meaning of the statute is that the recording device may be turned off only when the suspect expresses or shows that he or she will no longer participate in the interrogation unless the recording device is turned off. A refusal must be affirmative; it is not enough for officers to assume that the interrogation will yield better results if the recording device is turned off.

¶81 It is clear from the record that Detectives Lough and Salazar stopped recording their interrogation of Moore based on Moore's stated preference, not on his refusal to respond or cooperate. Immediately prior to the recorder being shut off, Detective Salazar emphasized that he and Detective Lough were not asking or encouraging Moore to have the recorder shut off, and that shutting it off was Moore's "choice." We must note that Detective Salazar previously offered to turn off the recorder if Moore asked for him to do so.

¶82 We do not ascribe any improper motives to the detectives' decision to turn off the recording device in this case. The detectives' decision appears to be exactly what Moore wanted. Nonetheless, giving juvenile suspects the "choice" of whether to have their questioning recorded would defeat the

28

purpose of the statute, which is to ensure that police do not use unfair tactics to elicit confessions from juveniles. In cases of questionable police conduct——however rare they may be—— courts would be able to analyze only the police tactics used to induce, euchre, or coerce the juvenile into "choosing" to have the recorder turned off, and would be able merely to draw inferences about the tactics used to obtain the juvenile's later statements and admissions.

¶83 After Moore's original request to turn the recording device off, he continued making statements and answering questions. His second request was similar to the first. Moore never told the detectives he would end the interrogation or stop answering questions if the recorder was left on. Detectives Salazar and Lough may have felt that they were getting incomplete or dishonest answers from Moore due to the recorder's presence, but that suspicion, coupled with Moore's request, was not enough to determine that Moore "refused to respond or cooperate."[20]

¶84 A majority of the court concludes that Moore did <u>not</u> refuse to respond or cooperate unless the recorder was turned

---

[20] Although this may seem at first to be an additional hurdle for law enforcement to clear in its pursuit of criminal suspects, we note that despite initial resistance to mandatory recording laws nationwide, an overwhelming majority of police departments prefer to record interrogations. <u>See</u> William A. Geller, <u>Videotaping Interrogations and Confessions</u>, in Nat'l Inst. of Justice, U.S. Dept. of Justice, Research in Brief 1, 10 (Mar. 1993).

off.  We recognize and appreciate the view that Moore should not benefit from being granted his stated wish, as long as his subsequent confession was voluntary.

## 2. Remedy for Violation of Recording Statues

¶85  Having determined that the failure to record parts of Moore's interrogation violated Wis. Stat. § 938.195, we now turn to the question of remedy.  Once again, Wis. Stat. § 938.31(3)(b) provides that "a statement made by [a] juvenile during a custodial interrogation is not admissible in evidence against the juvenile in any court proceeding alleging the juvenile to be delinquent unless an audio or audio and visual recording of the interrogation was made as required . . . and is available."[21]

¶86  The problem is that subsection (3)(b) speaks of "any court proceeding alleging the juvenile to be delinquent" and that this subsection is part of a section on the "fact-finding hearing"——e.g., the trial——in juvenile delinquency cases.

¶87  Wisconsin Stat. § 972.115(2)(a) provides a different remedy in felony criminal cases, namely, a jury instruction

> that it is the policy of this state to make an audio
> or audio and visual recording of a custodial
> interrogation of a person suspected of committing a

---

[21] Wisconsin Stat. § 938.02(3m) defines "delinquent" as "a juvenile who is 10 years of age or older who has violated any state or federal criminal law, except as provided in . . . [§] 938.183 . . . ."  Section 938.183, in turn, gives adult courts original jurisdiction over certain offenses alleged to have been committed by juveniles, including second degree reckless homicide.  See Wis. Stat. § 938.183.

felony and that the jury may consider the absence of an audio or audio and visual recording of the interrogation in evaluating the evidence relating to the investigation.

Wis. Stat. § 972.115(2)(a).

¶88 One way of reading these statutes reveals troubling incongruities in the statutory scheme. For example, if a juvenile's unrecorded statement would be excluded in juvenile delinquency proceedings but is admissible in adult court, the state will often have the power to overcome the consequences of an improper failure to record custodial interrogation by charging the juvenile with a specific felony or by seeking to waive the juvenile into adult court.

¶89 Permitting the use of unrecorded juvenile statements in major felony cases is plainly inconsistent with the court's decision in Jerrell C.J. However, determining whether such a result is what the legislature authorized and intended implicates the legislature's authority to supersede this court's exercise of superintending authority.

¶90 Resolving the question of remedy here would yield no satisfactory answer. Fortunately, that is not necessary on the facts of this case.

¶91 This court is highly mindful of the separation of powers. It does not engage in direct confrontation with another branch of government unless the confrontation is necessary and unavoidable. Here the potential confrontation is avoidable. No four members of this court agree on the proper remedy for a violation of Wis. Stat. § 938.195 in the criminal prosecution of

31

a person under the age of 17, but a majority does agree that any error in admitting Moore's confession was harmless in this case.

## C. Harmless Error

¶92 Assuming, arguendo, that Moore's unrecorded statements should have been suppressed by the court, we turn to whether any error was harmless.  Wisconsin's statutory harmless error test is laid out at Wis. Stat. § 805.18.  It states:

> The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party. . . . No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of . . . the improper admission of evidence . . . unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

¶93 Although a part of Wisconsin's codified civil procedure, Wis. Stat. § 805.18 applies to criminal proceedings as well.  State v. Armstrong, 223 Wis. 2d 331, 368 n.36, 588 N.W.2d 606 (1999).  We have previously adopted the test in Strickland v. Washington, 466 U.S. 668 (1984), as the test for harmless error analysis.  See Armstrong, 223 Wis. 2d at 368-69; see also State v. Dyess, 124 Wis. 2d 525, 544-45, 370 N.W.2d 222 (1985).

¶94 The harmless error inquiry asks whether "the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial."  Wis. Stat. § 805.18.  Stated differently, the question

is "whether it was 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Magett, 2014 WI 67, ¶29, 355 Wis. 2d 617, 850 N.W.2d 42 (quoting State v. Mayo, 2007 WI 78, ¶47, 301 Wis. 2d 642, 734 N.W.2d 115). Cf. State v. Harvey, 2002 WI 93, 291 Wis. 2d 673, 717 N.W.2d 74.

¶95 Under this framework, plea withdrawal is not warranted in this case. Moore pled guilty to second-degree reckless homicide as a party to the crime. Even if the statements Moore made while the recorder was turned off had been suppressed, it is clear beyond a reasonable doubt that he would have pled guilty to the reduced charge.

¶96 "[T]he second-degree reckless homicide statute requires 'both the creation of an objectively unreasonable and substantial risk of human death or great bodily harm and the actor's subjective awareness of that risk.'" State v. Neumann, 2013 WI 58, ¶74, 348 Wis. 2d 455, 832 N.W.2d 560 (citation omitted); see also Wis. Stat. § 940.06. The party to a crime statute imposes criminal liability on "whoever is concerned in the commission of a crime," including those who "aid and abet" the commission of the crime and those who are "party to a conspiracy with another to commit it . . . ." Wis. Stat. § 939.05.

¶97 Moore's statements made from 2:49 p.m. through 10:52 p.m., with a brief exception, are all recorded. He does not contend that statements made during this period are inadmissible, as he received the statutory protection and

benefit of a recording during most of that time.  His statements were voluntary.

¶98  Statements made by Moore prior to 10:52 p.m. include the following:

- He was "part of" the incident as "party to a crime"

- He knew Raynard had a gun

- He knew Raynard planned to rob someone

- He was supposed to get a portion of the money obtained in the robbery

- He acted as lookout and would have alerted Raynard if police had approached

- He lured Parish back to the window where Parish had purchased drugs just before Raynard shot Parish

- Raynard shot Parish, and they both fled on foot.

Moore provided detectives with numerous details to support this version of events.

¶99 Furthermore, detectives recorded Moore confessing to firing the gun himself after they covertly brought the recording device back into the interrogation room.  Although this confession took place after the recording device had been turned

off for a brief period, it was still admissible and had virtually the same content as Moore's unrecorded confession.[22]

¶100 Moore's situation at the pleading stage was virtually the same regardless of any possible error made by the circuit court in denying suppression of Moore's unrecorded statements. The State still had ample evidence to support the party to a crime charge that Moore ultimately pled to.[23]  Because we are persuaded beyond a reasonable doubt that Moore would have pled guilty to the same charge, we hold any error discussed herein to be harmless.

## IV. CONCLUSION

¶101 We agree that Moore's incriminating statements were voluntary.  However, Moore did not "refus[e] to cooperate" with police during his interrogation.  It was therefore a violation

---

[22] Moore contends that his confession after the recorder was turned back on should be inadmissible, relying on State v. Dionicia M., 2010 WI App 134, 329 Wis. 2d 524, 791 N.W.2d 236. Dionicia M. is distinguishable in a number of ways, primarily because it involved a police interrogation of a juvenile suspect that was unrecorded from the beginning until the suspect's confession.  Only after the suspect confessed did police record her statements.  Where, as here, a recording "bookends" the questioning with only a short period of time unrecorded in the middle, concerns about police coercion are far less prevalent.

[23] It is plausible that Moore's changing story throughout his interrogation is at least part of the reason the State amended the charge from first-degree reckless homicide to second-degree reckless homicide as a party to a crime. Regardless of which version of Moore's story the State relied upon, by 5:00 p.m. he had provided the detectives with details of his involvement sufficient to find criminal culpability under the amended charge.

of Wis. Stat. § 938.195 for police to cease recording the interrogation.

¶102 Nevertheless, the error, if any, in not suppressing some of Moore's statements, was harmless.  Moore admitted to participating in the crime prior to the recording being turned off, and he repeated his confession that he was the shooter after the recording was turned back on.  Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶103 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I agree with the majority opinion that all of Raheem Moore's statements to the detectives were knowing, intelligent, and voluntary. I join the majority opinion in that respect. I write separately because I believe that the majority opinion should take this opportunity to conclude that suppression of a juvenile's unrecorded statements under Wis. Stat. § 938.31(3)(b) is not an available remedy if a juvenile is in adult court. While a juvenile's statements during a custodial interrogation generally must be recorded, this case was an adult criminal court proceeding, not a juvenile court delinquency proceeding. My conclusions are based upon a plain meaning statutory analysis.

¶104 I write separately to clarify that this case has a somewhat unique posture. I hope to clarify that we should not conflate procedures and remedies available in juvenile court with those in adult court. To be clear, had the case been tried to a jury in adult court, Moore could have requested a jury instruction under Wis. Stat. § 972.115(2)(a), but relief under Wis. Stat. § 938.31(3)(b) would not be available. Moore was in adult and not juvenile court; hence, suppression of his unrecorded statements under § 938.31(3)(b) is not available to him because his case was not a "court proceeding alleging the juvenile to be delinquent." See Wis. Stat. § 938.31(3)(b). Moreover, a jury instruction is of little significance since Moore pled guilty in adult court. I write separately because the majority opinion stops short of clearly concluding that the

1

only available remedy to Moore would be a § 972.115(2)(a) jury instruction and that suppression under § 938.31(3)(b) is not available to Moore because he was in adult court.

¶105 "[W]e have repeatedly held that statutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoted source and citations omitted). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id. (citation omitted). "Where statutory language is unambiguous, there is no need to consult extrinsic sources of interpretation, such as legislative history." Id., ¶46 (citations omitted). "'In construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute.'" Id. (quoting State v. Pratt, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)). "We should not read into the statute language that the legislature did not put in." Brauneis v. LIRC, 2000 WI 69, ¶27, 236 Wis. 2d 27, 612 N.W.2d 635 (citing In the Interest of G. & L.P., 119 Wis. 2d 349, 354, 349 N.W.2d 743 (1984)). The majority opinion correctly recognizes these principles of statutory interpretation. Majority op., ¶¶75-76.

¶106 The majority opinion holds that the failure to record the entire custodial interrogation violated the recording requirement in Wis. Stat. § 938.195. Majority op., ¶¶84-85.

2

That statute provides: "A law enforcement agency shall make an audio or audio and visual recording of any custodial interrogation of a juvenile that is conducted at a place of detention unless a condition under [§] 938.31(3)(c)1. to 5. applies." Wis. Stat. § 938.195(2)(a). I do not quarrel with the legislative call to record a juvenile's statements during a custodial interrogation.

¶107 I also do not question that the remedy for a violation of the recording requirement is suppression under Wis. Stat. § 938.31. However, the legislature also determined that suppression under § 938.31 is available only in a juvenile court delinquency proceeding. This statute provides, in relevant part:

> Except as provided under par. (c), a statement made by the juvenile during a custodial interrogation is not admissible in evidence against the juvenile <u>in any court proceeding alleging the juvenile to be delinquent</u> unless an audio or audio and visual recording of the interrogation was made as required under [§] 938.195(2) and is available.

Wis. Stat. § 938.31(3)(b) (emphasis added). The majority opinion seems to avoid the inevitable conclusion that suppression under that statute is unavailable in adult court. Majority op., ¶¶86-91. We should adhere to the legislation's plain language.

¶108 Moore is not entitled to suppression under Wis. Stat. § 938.31(3)(b) in adult court. By this statute's plain terms, the suppression remedy applies in a "court proceeding alleging the juvenile to be delinquent." Wis. Stat. § 938.31(3)(b). A criminal prosecution in adult court is not a "court proceeding

3

alleging the juvenile to be delinquent." Therefore, this statute's suppression remedy for a juvenile delinquency proceeding does not apply in adult court, even if the adult court defendant is a juvenile. A court would have to impermissibly read language into this statute in order to determine that its suppression remedy applies in adult court. See Brauneis, 236 Wis. 2d 27, ¶27 (citation omitted) ("We should not read into the statute language that the legislature did not put in.").

¶109 I recognize that, had Moore chosen to have a jury trial in adult court, he could have requested a jury instruction under Wis. Stat. § 972.115 regarding the fact that the entire custodial interrogation was not recorded.[1] If given, such a jury instruction would not, however, find its basis in the juvenile code. Wisconsin. Stat. § 972.115 does provide:

> If a statement made by a defendant during a custodial interrogation is admitted into evidence in a trial for a felony before a jury and if an audio or audio and visual recording of the interrogation is not available, upon a request made by the defendant as provided in [§] 972.10(5) and unless the state asserts and the court finds that one of the following conditions applies or that good cause exists for not providing an instruction, the court shall instruct the jury that it is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony and that the jury may consider the absence of an audio or audio and visual recording of the interrogation in evaluating the evidence relating to

---

[1] I do not mean to suggest that a jury instruction is always required.

4

the interrogation and the statement in the case . . . .

Wis. Stat. § 972.115(2)(a) (emphases added). This statute, unlike Wis. Stat. § 938.31(3)(b), does not distinguish between adult and juvenile defendants. Instead, this statute allows for a jury instruction, under certain circumstances, in a felony prosecution tried before a jury in adult court. This statute plainly provides that Moore's potential remedy for the failure to record his entire custodial interrogation would have been to request a jury instruction, had his case been tried to a jury in adult court. He did not proceed to jury trial. A jury instruction is, thus, of little import in the case at issue.

¶110 Why the majority opinion seems to shy away from expressly holding that suppression was not available to Moore is unclear to me. Specifically, the majority opinion states that

> if a juvenile's unrecorded statement would be excluded in juvenile delinquency proceedings but is admissible in adult court, the state will often have the power to overcome the consequences of an improper failure to record custodial interrogation by charging the juvenile with a specific felony or by seeking to waive the juvenile into adult court.

Majority op., ¶88. This proposition is too cavalier for me. Waiver of a juvenile into adult court is not such an automatic result. Moreover, a prosecutor and a court should be highly suspect if waiver is being sought to avoid suppression of an unrecorded statement. In many instances, the State will not have the option of charging a juvenile with a crime that may be prosecuted in adult court. See Wis. Stat. § 938.18 (authorizing certain juvenile offenses to be waived into adult court if certain conditions are met); Wis. Stat. § 938.183(1) (listing

5

juvenile offenses over which adult courts have "exclusive original jurisdiction"). "The decision to waive juvenile court jurisdiction under Wis. Stat. § 938.18 is committed to the sound discretion of the juvenile court." In re Tyler T., 2012 WI 52, ¶24, 341 Wis. 2d 1, 814 N.W.2d 192 (citations omitted). I do not agree that law enforcement would flout the statutory recording mandate, thinking either that the prosecutor will "cover" for their disregard of the recording requirement by prosecuting a juvenile in adult court or that a juvenile court would waive a juvenile into adult court to avoid suppression under § 938.31(3)(b). In fact, recordings are the suggested practice under Wis. Stat. §§ 968.073(2) and 938.195(2) in either court.

¶111 Importantly, law enforcement officers already possess sufficient incentive to record an entire custodial interrogation of a juvenile because the officers do not know whether the case will proceed in adult or juvenile court. In fact, the vast majority of juvenile cases proceed in juvenile court, not adult court. Most officers would not risk suppression and would recognize that unrecorded statements of a juvenile could be suppressed under Wis. Stat. § 938.31(3)(b) in a juvenile delinquency proceeding. Thus, we need not fear that officers will be cavalier with respect to their statutory duty to record a custodial interrogation of a juvenile, given the fact that at the time of the recording, officers will not have any assurance that the case will be tried anywhere but juvenile court.

6

¶112 Also, the majority opinion states that it avoids a "direct confrontation with another branch of government" by declining to determine whether the suppression remedy under Wis. Stat. § 938.31(3)(b) applies in adult court. Majority op., ¶91. The majority opinion reflects that "[p]ermitting the use of unrecorded juvenile statements in major felony cases is plainly inconsistent with the court's decision in [In re Jerrell C.J., 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110]." Majority op., ¶89. In Jerrell C.J., the court held that a written confession made by a juvenile during a custodial interrogation was inadmissible as evidence in that juvenile court proceeding. Jerrell C.J., 283 Wis. 2d 145, ¶¶3, 36. The court went further to require recording of a juvenile's statements during a custodial interrogation and did so pursuant to its "supervisory authority." Id., ¶¶47, 49, 58. Subsequently, the legislature created § 938.31(3)(b), presumably to implement the holding from Jerrell C.J. Majority op., ¶¶68-69. In the present case, a separation-of-powers issue is not before the court, and the majority opinion should not decline to resolve whether suppression under § 938.31(3)(b) applies in adult court because the legislature has spoken. I would not use our supervisory authority to now create additional relief, and I believe that the legislation's plain language deserves its due.

¶113 Further, I conclude that the circuit court did not err by denying Moore's suppression motion. The majority opinion undertakes an analysis as if the circuit court erred in denying Moore's suppression motion. Specifically, it states that,

7

"[a]ssuming, arguendo, that Moore's unrecorded statements should have been suppressed by the court, we turn to whether any error was harmless." Majority op., ¶92. It goes on to hold that "any possible error made by the circuit court in denying suppression of Moore's unrecorded statements" was harmless. Majority op., ¶100. Because the circuit court did not err, I would not assume for the sake of argument that the circuit court erred.

¶114 The circuit court denied Moore's suppression motion on the grounds that suppression under Wis. Stat. § 938.31(3)(b) was unavailable to Moore because he was being tried in adult court. The circuit court reasoned that Wis. Stat. ch. 938 "deals with juveniles in delinquency proceedings." Wisconsin Stat. ch. 972, the circuit court explained, "deals with defendants in adult proceedings. Not adult defendants. Defendants." Thus, the circuit court held that, "if I find that there was [not a] refusal, that [sic] what would happen is the statement would be admissible, but there would be a——an instruction that would be given explaining the ramifications of that."

¶115 In sum, the circuit court correctly denied Moore's suppression motion on the grounds that, because Moore was tried in adult court, suppression under Wis. Stat. § 938.31(3)(b) was not available to him. Because the circuit court did not err by denying the suppression motion, there is no need to undertake a harmless error analysis.

¶116 For the foregoing reasons, I respectfully concur.

¶117 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

8

¶118 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* When the defendant was 15 years old, he was interrogated by the police about a murder that had recently taken place. After roughly 11 hours in custody, the defendant confessed to the crime. The defendant now seeks to suppress his confession.

¶119 The defendant argues that admission of his confession would violate the federal and state constitutions because the confession was not voluntary.[1] The defendant further argues that admission of his confession would violate Wis. Stat. § 938.195 (2007-08),[2] which requires that "any custodial interrogation of a juvenile that is conducted at a place of detention" be recorded.[3]

¶120 I conclude that the defendant's confession was not voluntary under the federal and state constitutions. Because admission of the confession was not harmless error, the confession should be suppressed.

¶121 A confession is voluntary if it is "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the

---

[1] See State v. Jerrell C.J., 2005 WI 105, ¶17, 283 Wis. 2d 145, 699 N.W.2d 110 (explaining that if a defendant's confession is constitutionally "involuntary," then its admission violates the defendant's due process rights under the Fourteenth Amendment of the federal constitution and Article I, Section 8 of the Wisconsin Constitution). See also majority op., ¶55.

[2] All subsequent references to the Wisconsin Statutes are to the 2007-08 version unless otherwise indicated.

[3] Because my analysis of the constitutional issue is dispositive, I would not reach the recording statute issue.

1

defendant by representatives of the State exceeded the defendant's ability to resist."[4]

¶122 Whether a confession is voluntary and thus constitutionally valid depends on the totality of the circumstances surrounding the confession.[5] In conducting this totality-of-the-circumstances review, a court weighs a defendant's personal characteristics (including the defendant's "age, education and intelligence . . . and prior experience with law enforcement") against the interrogation methods employed by the State (including "the length of questioning"; the presence of a parent, attorney, or other interested adult; and "whether the defendant was informed of the right to counsel and right against self-incrimination").[6]

¶123 Courts must exercise "special care" when assessing the voluntariness of a juvenile's confession,[7] as children are "uncommonly susceptible" to suggestive and coercive police interrogation techniques.[8]

---

[4] Majority op., ¶¶55, 65 (quoting State v. Lemoine, 2013 WI 5, ¶17, 345 Wis. 2d 171, 827 N.W.2d 589). See also Jerrell C.J., 283 Wis. 2d 145, ¶16.

[5] Majority op., ¶56; Jerrell C.J., 283 Wis. 2d 145, ¶20.

[6] Majority op., ¶56 & n.17. See also Jerrell C.J., 283 Wis. 2d 145, ¶30; State v. Hoppe, 2003 WI 43, ¶39, 261 Wis. 2d 294, 661 N.W.2d 407.

[7] In re Gault, 387 U.S. 1, 45 (1967); Haley v. Ohio, 332 U.S. 596, 599 (1948).

[8] Jerrell C.J., 283 Wis. 2d 145, ¶26.

¶124 In the instant case, I weigh the relevant personal characteristics of the defendant against the interrogation methods employed by the State as follows:

- The defendant was 15 years old when he confessed. His young age is a factor weighing against the voluntariness of the confession.

- The defendant was in eighth grade at the time of his confession. His relatively low education level is a factor weighing against the voluntariness of the confession.

- The defendant exhibits borderline intellectual functioning.[9] The defendant's low intelligence level is a factor weighing against the voluntariness of the confession.

- The defendant has a history of learning disabilities. The defendant may therefore have struggled to understand his <u>Miranda</u> rights and the consequences of waiving them. Consequently, this factor weighs against the voluntariness of the confession.

---

[9] An evaluation of the defendant performed at the State's request determined that the defendant functions in the "borderline" range of intelligence, meaning his intelligence quotient (IQ) score is between 71 and 84. An evaluation of the defendant performed at the defendant's request similarly concluded that the defendant's IQ score falls between 69 and 79. Intellectual disability, also known as mental retardation, is commonly defined as an IQ score of 70 or below. <u>See</u> MedLine Plus, U.S. Nat'l Library of Medicine, "Intellectual disability" (last updated May 10, 2013), http://www.nlm.nih.gov/medlineplus/ency/article/001523.htm.

- The defendant was diagnosed with at least three mental health issues: attention deficit/hyperactivity disorder, mood disorders, and conduct disorders. In addition, he has previously displayed problems with substance abuse. The defendant's mental health issues and behavioral problems are factors weighing against the voluntariness of the confession.

- The defendant had previous experience with law enforcement at the time of his confession——namely, two prior arrests that both resulted in misdemeanor delinquency findings. His experience with law enforcement was not extensive and does not weigh in favor of voluntariness.

- The defendant was in custody for about 11 hours before he confessed. During that time, the defendant was repeatedly interrogated by two sets of detectives for a total of nearly six hours.[10] The duration of the interrogation weighs against the voluntariness of the confession.

- The defendant did not confer with a friendly adult at any point during the interrogation. The absence of a parent, attorney, or other interested adult at the defendant's

_____

[10] "Police complete nearly all interrogations of juveniles and adults in less than one or two hours. By contrast, they extract the vast majority of false confessions only after interrogating suspects for six hours or longer . . . ." Barry C. Feld, Police Interrogation of Juveniles: An Empirical Study of Policy and Practice, 97 J. Crim. L. & Criminology 219, 308 (2006).

interrogation weighs against the voluntariness of the confession.[11]

- The defendant did not demonstrate that he understood his right to counsel.[12] At one point, a detective stated as follows: "If you decide to answer questions now without a lawyer present, you have the right to stop questioning at any time you wish and the right to ask for and to have a lawyer at any time you wish, including during questioning." The detective then asked, "What does that mean in your own words?" The defendant replied by stating: "That mean like, if I'm talking to you all, then I don't want to say no more, I can just, um, don't say nothing."

---

[11] The record does not reveal whether the police actually contacted the defendant's parents, although they informed the defendant that they had. It is undisputed, however, that the defendant had no opportunity to confer with a friendly adult during the interrogation. "[T]he failure 'to call the parents for the purpose of depriving the juvenile of the opportunity to receive advice and counsel' will be considered 'strong evidence that coercive tactics were used to elicit the incriminating statements.'" Jerrell C.J., 283 Wis. 2d 145, ¶43.

[12] See Miranda v. Arizona, 384 U.S. 436, 444 (1966); Jerrell C.J., 283 Wis. 2d 145, ¶20 (stating that courts determining the constitutional validity of confessions should consider "whether the defendant was informed of the right to counsel and right against self-incrimination").

A forensic evaluation of the defendant performed at the request of the defendant's attorneys concluded that "significant questions exist as to [the defendant's] competence to waive his Miranda rights" and that "significant concerns exist regarding the reliability of [the defendant's] confession."

The defendant explained his right to stop speaking but did not demonstrate that he understood he could ask for an attorney or have an attorney present at any time (including during questioning). This exchange, which suggests the defendant did not fully grasp his <u>Miranda</u> rights, weighs against the voluntariness of the confession.

- The detectives' conduct in interrogating the defendant was not egregious.[13] The detectives spoke in a conversational tone and were not unduly aggressive in their demeanor while they isolated the defendant in the interrogation room. However, the detectives employed psychological tactics to which juveniles and those with low intelligence are especially vulnerable.[14] For example, the detectives continually challenged the defendant's denials of culpability, urged the defendant to tell the truth, and misinformed the defendant about various aspects of their investigation. The use of these psychological techniques in the instant case exceeded the defendant's ability to resist and weighs against the voluntariness of the confession.

---

[13] "[T]he totality of the circumstances standard does not require that egregious or outrageous police conduct be present. . . ." <u>Hoppe</u>, 261 Wis. 2d 294, ¶58.

[14] "When used against vulnerable suspects, standard police interrogation techniques are especially apt to lead to false confessions. Juveniles and the mentally retarded are the most vulnerable to modern psychological interrogation techniques." <u>Jerrell C.J.</u>, 283 Wis. 2d 145, ¶104 (Abrahamson, C.J., concurring).

6

• The cumulative effect of these factors under the totality of the circumstances test weighs against the voluntariness of the confession.

¶125 In sum, the defendant, a 15-year-old eighth grader of borderline intelligence, was in custody for roughly 11 hours; was interrogated for periods totaling nearly six hours; was subject to psychological interrogation methods; had no parent, attorney, or interested adult present during his interrogation; and did not demonstrate an understanding of his Miranda rights before making incriminating statements to the police.

¶126 The personal characteristics of the defendant and the interrogation methods employed in the present case are substantially similar to those in State v. Jerrell C.J., 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, and the same result should ensue. The confession in Jerrell C.J. was suppressed.

¶127 Considering the factors outlined above and the court's holding in Jerrell C.J., and exercising special care as the case law compels me to do, I conclude that the defendant's confession was not voluntary and thus is not constitutionally valid. Because admission of the confession was not harmless error,[15] the confession should be suppressed. I would reverse the decision of the court of appeals and remand the cause for further proceedings.

---

[15] An error is harmless if the beneficiary of the error (here the State) proves beyond a reasonable doubt that the error complained of did not contribute to the result. State v. Hale, 2005 WI 7, ¶60, 277 Wis. 2d 593, 691 N.W.2d 637. The State cannot meet its burden of proof in the instant case.

7

¶128 For the reasons set forth, I dissent.

¶129 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.